Holmes and others *against* Remsen and others, Executors of Clason.

THIS was an action of *assumpsit,* brought by the plaintiffs, as *trustees,* &c. of *Frederick Mullett,* an absent debtor, against the defendants, as executors of *Isaac Clason,* deceased. The declaration contained the usual money counts, and on an account stated between *Clason* and *Mullett,* alleging the promise to be by *Clason* to *Mullett.* There were other counts, which stated the promise to be from the defendants to *Mullett;* and similar counts, stating the promise to be from the defendants to the plaintiffs. The defendants pleaded the general issue, and, by a written agreement, the attorneys of the parties stipulated that, on the trial of the cause, the following facts should be admitted as

*Payment by a garnishee, under a judgment and execution on a foreign attachment in the Lord Mayor's Court of London, of a debt due by a citizen in New-York, to a creditor in London, being compulsory, is a good bar to an action brought here against the*

debtor, under the act giving relief against absent and absconding debtors; though the *attachment* here, against the absent debtor, was issued before the money of the debtor came into the hands of the *garnishee,* or even before the foreign attachment issued in *England.*

ALBANY,
August, 1822.

HOLMES
v.
REMSEN.

proved : *Isaac Clason*, of the city of *New-York*, a merchant, died in *February*, 1815, and the defendants are his executors. *C.*, at the time of his death, was indebted to *M.*, on the balance of an account, two thousand six hundred and sixty-five pounds, one shilling and ten pence, sterling, and which was never paid to *M.*, or the plaintiffs. After the said sum became due and payable, *M.*, on the 14th of *February*, 1815, became, and was duly declared a *bankrupt*, according to the laws of *England ;* and, on the same day, an assignment of all his personal estate and choses in action, was duly made, by the commissioners named in the commission of bankrupt, to *Henry Page*, in trust, for the creditors of *M.* On the 25th of *February*, 1815, the commissioners and *Henry Page*, assigned all the personal estate, and choses in action of *M.*, in the manner prescribed by the laws of *England,* to three assignees, named. On the 26th of *February*, 1815, *M.*, in consideration of ten shillings, assigned to the same three assignees, " all the debts, personal estate, and effects, whatsoever, of him, *F. M.*, not being, arising, or growing within *England*, which he was entitled to, or possessed of, or which any other person or persons were possessed of, or entitled to, in trust for him," in trust, for the same purposes mentioned in the former deeds of assignment.

*F. M.* is a natural born subject of the King of *Great Britain* and *Ireland*, residing in *London*, where he has been a merchant for above twenty years. On the 7th of *August*, 1816, a warrant was issued under the act entitled, " An act for relief against absent and absconding debtors," (1 *N. R. L.* 157. sess. 24. ch. 41.) to attach the estate of *F. M.* in this state, of which notice was duly published on the 8th of *August*, 1816 ; and on the 27th of *August*, 1817, the plaintiffs were duly appointed trustees for all his creditors, pursuant to the act.

In the lifetime of *Clason*, a ship, called " *The Star*," belonging to him, was libelled and condemned in the Admiralty Court at *Halifax*, *Nova Scotia ;* and he appealed from the sentence of condemnation to the High Court of Admiralty in *England*, and appointed Messrs. *Baring, Brothers & Co.* of *London*, his agents, to prosecute the appeal. The ap-

peal was pending when *C.* died ; and the defendants appointed *Baring, Brothers & Co.* their agents, in regard to the appeal. On the 21st of *May,* 1818, *Baring, Brothers & Co.,* with the approbation of the defendants, compromised the appeal, and received from the captors of the ship a large sum of money, for the use of the defendants. In *October,* 1818, the assignees of *Mullett,* as a bankrupt, pursuant to law and the *custom of London,* procured an attachment to be issued out of the Lord Mayor's Court of that city, by virtue of which, the sum of £3,167 sterling, money of the defendants, was attached in the hands of *Baring, Brothers & Co.,* and by regular proceedings thereupon, judgment was rendered in the Lord Mayor's Court, in favour of the assignees, for £3,024 1s. 6d. sterling, of the moneys of the defendants in the hands of *Baring, Brothers & Co.* ; and, on the 1st of *February,* 1819, the assignees of *M.* had execution for that sum, and *Baring, Brothers & Co.* were compelled to pay that amount to the assignees.

The cause was tried at the *New-York* Sittings, before Mr. Justice *Platt,* on the 12th of *April,* 1821, when a verdict was taken, under the direction of the Judge, for the plaintiffs, for 17,095 dollars and 4 cents, subject to the opinion of the Court, on a case containing the above facts.

*Caines,* for the plaintiffs, contended, 1. That the Commissioners' assignment, under the *English* statutes of bankrupts, was merely a statutory transfer, under the municipal law of *Great-Britain* ; and was, therefore, inoperative and void, as against an *American* citizen, an attaching creditor of the bankrupt, residing in the *United States.* It is not denied, as a *general* rule, that the personal property follows the *domicil* of the owner ; but it is not correct as a *universal* proposition. (*Harvey* v. *Richards,* 1 *Mason's Rep.* 431. Per *Story,* J.) We claim the benefit of the exception to the general rule ; that whenever a citizen of the country where the property is situated, has a debt or demand against the owner of it, who is domiciled in another country, the property has, in that respect, a *situs* or locality, and does not follow the domicil of the owner, but is to be regarded as the representative or substitute of the owner. Under the

ALBANY,
August, 1822.

HOLMES
v.
REMSEN.

operation of the laws of this state, allowing attachments against the property of absent or absconding debtors, the personal property of the debtor is local. Property is merely an incident of the person; and if the person himself was now here, he could not protect himself against the claim of the plaintiffs, by alleging that his *domicil* was in another country. So, neither can his property, which, in regard to his creditors here, is the substitute of his person, be protected by such plea. Where a person dies in a foreign country, possessed of property here, the distribution is to be made among the legatees, or those claiming as heirs, by succession, according to the law of the place of the testator's or intestate's domicil; but, if there are creditors here, they are to be paid according to the law of the place where the property is found. (*Selectmen of Boston* v. *Boylston*, 4 *Mass. Rep.* 318. *Richards* v. *Dutch*, 8 *Mass. Rep.* 506.) The Supreme Court of *Massachusetts*, in the cases cited, make a distinction between the law of distribution, and the law of payment. In the case of *Bird and others* v. *Pierpoint*, (1 *Johns. Rep.* 118.) *Spencer*, J. says, "that this Court will not suffer the discharge of an insolvent, under the laws of the state where he is *domiciled*, to operate against a creditor who resides without the state, and whose debt was contracted elsewhere." (*Van Raugh* v. *Van Arsdaln*, 3 *Caines' Rep.* 154.) And, "if we will not take notice of the act of insolvency, under such circumstances, in favour of the insolvent whose whole property has been devested to satisfy his creditors, surely we cannot notice the bankruptcy in *England*, to defeat the recovery of a debt indisputably just."

Should it be said, that the attachment here ought to have issued against the assignees of *M.*, and not against the executors of *C.*, we answer, that executors and administrators are *personal representatives;* but assignees are not. As *nemo est heres viventis*, so, a person living has no personal representatives. The assignees cannot sue in their own names, for foreign debts. (*Bird* v. *Caritat*, 2 *Johns. Rep.* 345.)

Relying on the *exception* which has been stated, we shall proceed to show, that the cases which will be relied on, in

support of the general rule, are not applicable to the present case ; and this, *first,* from the cases themselves ; *second,* from the admissions of the counsel, and of the Judges before whom they were argued and decided. It must be kept in view, that this is the case of an *American* citizen, claiming from an *American* citizen, in an *American* Court, the benefit of an *American* statute, as to property within the *United States of America,* against the pretended bar of an *English* statute, set up in favour of *English* subjects.

*First ;* Captain *Wilson's* case, cited in 1 *H. Bl.* 691, and *Neale* v. *Cottingham and Houghton,* cited in 1 *H. Bl.* 132. note. *Stein's* case, or *The Bank of Scotland and others* against *Cuthbert and others,* (1 *Rose's Cases in Bankruptcy,* 201. 462. *Appendix.*) *Selkrig* v. *Davies,* (2 *Rose's Cases,* 97. 291. S. C. 2 *Dow's Rep.* 230.) *Hunter* v. *Potts,* (4 *Term Rep.* 182.) *Phillips* v. *Hunter,* (2 *H. Bl.* 405.) are all cases between *British* subjects, claiming within different parts of the *British* empire, (some in *Scotland* and some in *Ireland,*) against the right of *British* assignees, under an *English* commission of bankrupt. The case of *Sill* v. *Worswick,* (1 *H. Bl.* 665.) was not only a case between *British* subjects, but where " goods and specific effects," as found by the special verdict, were claimed by a *British* subject, who commenced his proceedings for the recovery of them in *England,* against *English* assignees, under an *English* commission. The case of *Solomons* v. *Ross,* (1 *H. Bl.* 131. note,) is acknowledged by *Eyre,* Ch. J. and by Chancellor *Kent,* (4 *Johns. Ch. Rep.* 475.) on the facts stated, to be an erroneous decision. The case of *Jollet* v. *Deponthieu,* (1 *H. Bl.* 132. note,) was not only not a decision on the question, but having, as *Eyre,* Ch. J. observed, eventuated in an injunction, " was strongly urged as confirming what it prevented." *Secondly.* These cases are admitted by *British* counsel and *British* Judges, not to be applicable to a case like the present, or between foreigners. In *Hunter* v. *Potts, Law,* for the plaintiff, says, " by the decisions, the operation of the bankrupt laws on property situated in other countries, is fully established, *at least, against those who are subject to the dominion of our laws.*" Again ; he says, " from a review of the

authorities, it appears, that however the question may be as between subjects of this country and foreigners residing in the country where the bankrupt's property lies, yet, as between subject and subject in this country, the Courts will not sustain acts done by them in direct contravention to the policy of the laws to which they owe obedience." In the same case, Lord *Kenyon* observes, " It must be remembered, that during the progress of the business, all these parties resided in *England.*" And in *Phillips* v. *Hunter,* (2 *H. Bl.* 405.) Ch. J. *Eyre,* says, " All these facts appearing on the record, this case must be argued as arising between *English* subjects, upon *English* property." In *Sill* v. *Worswick,* (1 *H. Bl.* 689.) Lord *Loughborough* says, ." It is not a question whether the bankrupt laws have any operation in *St. Christophers,* but whether they operated at *Lancaster,*" the place where *Worswick* resided, and from whence he went to *London* to make his affidavit before the Lord Mayor, to ground his proceedings.

A few *dicta* of *English* Judges, may be adduced by the defendant's counsel, in support of the general proposition, but they were extra-judicial opinions, and the result of *British* policy. For it is the policy of *Great Britain* to extend the operation of bankrupt laws. Being the greatest commercial nation on the earth, the property of her subjects is diffused throughout every portion of the globe. She credits much more than she is debited. Under domestic commissions, she will collect from all quarters of the world ; under a foreign commission, she would pay in a few instances only. To allow, therefore, of that comity of which her Judges speak, or, in other words, to abrogate foreign attachments, in favour of *English* commissions of bankrupt, would be to enable her to collect much and pay little.

The cases which have been cited, decide, that against an *English* statute of bankrupts, in an *English* Court of Justice, an *Englishman* cannot set up against an *English* claim, an *American* attachment law. Now, we say, that, on the same principle, against an *American* attachment law, in an *American* Court of Justice, an *American* citizen cannot set up against an *American* claim, an *English* statute of bankrupts. The same rule must operate on both sides. The

same principle which decided in *British* Courts, in favour
of *British* assignees, under a *British* commission, must de-
cide in favour of *American* trustees, under the *American*
attachment law. This is admitted by the eminent *English*
counsel who argued in the cases cited. Thus, *Bower*, in the
case of *Hunter* v. *Potts*, (4 *Term Rep.* 100.) says, " If a
subject of *Rhode Island* had been a creditor of the bank-
rupt, and had, even after the commission issued here, at-
tached property of the bankrupt there, it is not to be sup-
posed, that the Courts of law would have turned him round,
to seek his remedy under the commission in this country."
Again, (*ib.* 191.) he says, " It is, also, worthy of con-
sideration, that if transactions of this nature can be over-
hauled, the subjects of this country will be put in a more dis-
advantageous situation than *foreign creditors, who will be
at liberty to attach the bankrupt's property abroad,* to the
prejudice of our subjects, and without any benefit to the
bankrupt's estate :" Thus, the right of foreign creditors to
attach the property of an *English* bankrupt, in opposition
to the *English* commission, is admitted, and was never
contradicted. So, Ch. J. *Eyre*, in *Phillips* v. *Hunter*,
(2 *H. Bl.* 412.) says, " It was well said in the argument,
you admit that an *American* might, in this case, have pursued
his legal diligence, in the Courts of his own country, not-
withstanding our bankrupt laws, and that you could not
have taken the money recovered from him, and given it to
the assignees." Though the other Judges differed from
*Eyre*, Ch. J. on the question, whether they could take the
money from the *English* creditor, and give it to the assignees
of the bankrupt ; yet none of them hinted even a doubt
of the right of the *American* creditor, under the attachment
law of his own country, against the *English* assignees un-
der a *British* commission. Lord *Kenyon* himself, (4 *Term
Rep.* 192.) limits the general proposition contended for
by the defendants, to cases, where it is " uncontradicted by
the laws of any other country." In *Quin* v. *Keefe*, (2 *H.
Bl.* 553.) *Le Blanc, arguendo*, said, " There is no instance
of a certificate, or any thing analogous to it, in a foreign
country, being allowed to be a bar to the recovery of a
debt contracted in *England*." And *Eyre*, Ch. J. says,

ALBANY,
August, 1822.

HOLMES
v.
REMSEN.

"I agree with the distinction made by my brother, *Le Blanc*, between the cases of a debt contracted in a foreign country, and here." In *Stein's* case, (1 *Rose's B. C.* 482.) Lord *Bannatyne* observes, "although a commission of bankrupt was ever so fairly obtained; yet, if it be produced here, and we are satisfied that the party is not domiciled in *England*, but in *Scotland*, I should hold, in that case, that we are not bound to give effect to the commission." And he had doubts whether they ought not to grant the sequestration. Lord *Craigie*, reserving himself as to the effect of the sequestration, said, "I have no idea that, *ipso jure*, an *English* commission destroys the operation of diligence in *Scotland*." Thus, it seems, that even in *Scotland*, it depends on circumstances, whether a prior *English* commission shall prevent an attachment. Lord *Meadowbank*, says, (*ib.* 481.) "It was formerly a principle, that a judicial transfer only operated *infra territorium*, and had no binding influence beyond it." He "thought it was a difficult thing to deviate so far from principle, as to transfer property in *Scotland*," without regard to the forms and rules of that country; but that he yielded to the consideration, "that it had been recognised as law, by judgments of the Chancellor, for so long a period, that it might be considered as a principle of the law of nations." But when was the new rule recognised and established? And by whom? In *Selkrig* v. *Davies*, (2 *Dow's Rep.* 230—248.) Lord *Eldon* said, "he agreed with a distinguished writer (*Bell*) on the *Scotch* bankrupt law, that all the cases prior to that of *Strothers* exhibited a very distressing versatility of opinion; for he confessed he was unable to discover any principle common to them all." Why were the various opinions of the *Scotch* Judges considered as distressing? They were contending for judicial independence; for old rules: so are the plaintiffs. The Chancellor (4 *Johns. Ch. Rep.* 468—472.) cites Lord *Bacon* and *Huberus*. Lord *Bacon* qualifies his position by confining it to cases, *quæ nil ad jurisdictionem pertinent;* and here the only question is as to jurisdiction; whether it shall be exercised over this property by the Courts of *Westminster Hall*, or of *New-York?* So, *Huberus*, admitting that the foreign law, in itself, has no opera-

tion, limits the comity to be exercised towards it, to cases in which it may be yielded, *sine suo suorumque præjudicio.*" But is it no prejudice to our citizens, to send them three thousand miles from home, to obtain payment; to take from them the property to which they trusted, and transfer it to foreign creditors? Lord *Ellenborough*, himself, in *Potter* v. *Brown*, (5 *East's Rep.* 124—131.) decides the question in favour of the attachment law of this state. He says, " we always import, together with their persons, the existing relations of foreigners, as between themselves, according to the laws of their respective countries ; *except, indeed, when those laws clash with the rights of our own subjects here, and one or other of the laws must necessarily give way, in which case our own is entitled to a preference.*" In *Harrison* v. *Sterry*, (5 *Cranch's Rep.* 389—202.) the Supreme Court of the *United States* say, that, " as the bankrupt law of a foreign country is incapable of operating a legal transfer of property in the *United States*, the remaining two-thirds of the fund are liable to the attaching creditors, according to the legal preference obtained by their attachments." It is admitted, that the attachments, in that case, were prior to the issuing of the *English* commission of bankrupt ; but whether the attachment is prior, or subsequent to the commission, can make no difference ; and such was the opinion of the Supreme Court of *Pennsylvania*, who, in the case of *Milne* v. *Moreton*, (6 *Binney's Rep.* 353.) decided, after solemn argument, that the subsequent attachment, under the law of that state, overreached the prior *English* commission.

Next, let us look at the consequences of the doctrine contended for by the defendants. The whole nation, if we may judge by the decision of Congress, are opposed to a bankrupt law of the *United States;* and must our citizens be made subject to foreign bankrupt laws? Are our Courts to become ancillary to foreign Courts, by giving effect to foreign laws of bankrupts? The several states, though they cannot pass *bankrupt* laws, may, by establishing this doctrine in their Courts, set up as many bankrupt laws as there are countries with whom they trade. If the *English* commission is to operate as a statutory transfer, to what period,

short of that expressed in the statute, can it be limited? It must be interpreted according to the terms of the statute, and have relation back to the act of bankruptcy; and thus overhaul transfers, judgments, executions, and vacate payments, &c.

2. The assignment by the bankrupt, himself, in this case, being made, *eodem flatu, et eodem intuitu,* with the commissioners' assignment, is a part, merely, of the same assignment, making, together, one conveyance, of which the assignment of the commissioners is the principal. It is a link in the chain of conveyance. It must, therefore, follow the fate of the statutory conveyance.

3. If the bankrupt's own assignment is not a part of the same conveyance, it is an act of bankruptcy, in itself, and void by the law of the country where it was made; or, in effect, a nullity, as the bankrupt had nothing to assign. (*Cullen's Bank. Law.* 50, 51, 52. 11 *Vesey,* 83.)

4. If the bankrupt's assignment stood alone, it would be fraudulent and void, as against the laws of this state. (*Jackson* v. *Jackson,* 1 *Johns. Rep.* 424. *Borden* v. *Fitch,* 15 *Johns. Rep.* 121. *Monk* v. *Abel,* 3 *Bos. and Pull.* 35.)

5. The assignment by the bankrupt, himself, being a mere *voluntary* conveyance, is void by the statute of frauds. The term *voluntary* is used in contradistinction to an assignment for a valuable consideration. For it is so far from being voluntary, in any other sense, that, as was observed by *Law, arguendo,* in *Hunter* v. *Potts,* "it is by the *compulsory* force of the legislature." The argument that it is not held voluntary in *England,* but for a valuable consideration, that is, the discharge of the bankrupt, does not apply here; for the bankrupt's certificate does not discharge him from debts due here. (4 *Term Rep.* 193. 1 *Johns. Rep.* 112. 3 *Caines' Rep.* 154.) The words of our statute are very comprehensive. (1 *N. R. L.* 75 sess. 10. ch. 44.) It is, indeed, declaratory of the common law, by which such a conveyance would be a nullity, as against creditors. (*Cowp.* 434. 3 *Co.* 82. *Jackson* v. *Myers,* 18 *Johns. Rep.* 427. *Sands* v. *Codwise,* 4 *Johns. Rep.* 598. *Anderson* v. *Roberts,* 18 *Johns. Rep.* 514. 2 *Johns. Ch. Rep.* 565. 14 *Johns. Rep.* 458.)

6. The payment, by the defendants, of the debt due by the absent debtor, being made after notice of the attachment, was made in their own wrong. (1 *N. R. L.* 157. sess. 24. ch. 49. sec. 5. 23.)

7. The placing in *London*, on the 21st of *May*, 1818, the debt due from the absent debtor, in the hands of *Baring, Brothers & Co.* (some of the partners of which house were assignees under the *English* commission,) was, in law, a fraud on the vested rights of the *American* attaching creditor. (1 *N. R. L.* 159. sess. 24. ch. 49. s. 10. *Johnson* v. *Bloodgood*, 1 *Johns. Cases*, 51. *Wardell* v. *Eden*, 2 *Johns. Cases*, 121. *Tuttle* v. *Bebee*, 8 *Johns. Rep.* 152.)

8. The subsequent judgment of the Mayor's Court of *London* was, therefore, in law, fraudulent; and payment under it, is no valid defence against the claims of the *American* attaching creditor, under the previous attachment sued out, and notified according to the law of this state. On laying the attachment in *London*, the garnishees ought to have given notice to the defendants; and, for not doing so, a garnishee has been held liable to pay over to the defendant in the attachment, the amount he had before paid, under the judgment, obtained on an attachment to the attaching creditor. (*Fisher* v. *Lane*, 3 *Wils.* 297. S. C. 2 *Black. Rep.* 834. cited in 3 *East*, 372. *M'Daniel* v. *Hughes*, 3 *East*, 367.)

9. The agents, in *London*, of the defendants here, might have pleaded the attachment here in bar of the subsequent attachment in *London* ; and, not having done so, the defendants are liable. (*Embree & Collins* v. *Hanna*, 5 *Johns. Rep.* 103. *Brook* v. *Smith*, 1 *Salk.* 280. *Privileges of London*, 254. 270. *Stevenson* v. *Pemberton*, 1 *Dallas' Rep.* 3. *Walker* v. *Gibbs*, 2 *Dallas' Rep.* 211. 1 *Salk.* 291. *Masters* v. *Lewis*, 1 *Lord Raym.* 567. *Lewis* v. *Walker*, 2 *T. Jones*, 222. *Blacquiere* v. *Hawkins*, *Doug.* 380. 1 *Comyns' Dig.* 582. *Ross* v. *Clark*, 1 *Dallas' Rep.* 354. *M'Combe* v. *Executors of Hudson*, 2 *Dallas' Rep.* 73.)

10. The defendants, by the custom of *London*, might, within twelve months, have filed bail, after the judgment against the garnishees, and pleaded the attachment here ; and, having neglected to do so, the payment under that

judgment is voluntary, and no defence to the present action. (*M'Daniel* v. *Hughes*, 3 *East*, 375, 376. 380. *Privileges of London*, 237. 244. 251. *Dyer*, 196 *b*. *Lutw*. 991. 1 *Brownl*. 60. *Marriott* v. *Hampton*, 7 *Term Rep*. 269. *Loomis* v. *Parker*, 9 *Johns. Rep*. 244. *Blacquiere* v. *Hawkins*, *Doug*. 380.)

11. The commission against *Mullett* was sued out, and the assignment under it made, *flagrante bello*, between the *United States* and *Great-Britain*; consequently, both the commission, and the proceedings under it, were null and void, as against *American* citizens. (*Griswold* v. *Waddington*, 16 *Johns. Rep*. 438. *Selkrig* v. *Davies*, 2 *Dow's P. C*. 230. 2 *Rose's B. C*. 201. *Wilkes* v. *Peterson*, 7 *Taunt*. 439.)

*P. A. Jay*, contra. 1. This cause has been already argued and decided in the Court of Chancery; (4 *Johns. Ch. Rep*. 460.) and it might be thought sufficient, perhaps, merely to refer to the very learned and able opinion delivered by his honour the Chancellor, on dismissing the plaintiffs' bill; but the elaborate argument which the Court has just heard, renders it proper to examine the principal points and authorities which have been relied upon in support of the plaintiffs' claim.

The attachment law of this state, under which the plaintiffs claim, gives no exclusive advantage to the attaching creditor. The attachment is for the equal benefit of *all* the creditors, wheresoever they may reside; for *English* as well as for *American* creditors. So, on the other hand, the assignment under the *English* bankrupt law, is for the equal benefit of *all* the creditors of the bankrupt, wheresoever they may reside; for *American* as well as *English* creditors. The *English* assignees of *Mullett*, the bankrupt, and the plaintiffs who have been appointed trustees, under the law of this state, of *Mullett*, as an absent debtor, are trustees for the very same individuals. The creditors of *M*. have already received from the defendants the full amount of the debt demanded in the present action; and the plaintiffs now ask this Court to compel the defendants to pay the same debt, a second time, for the benefit of the same indi-

viduals. Conscious of the injustice of their claim, the plaintiffs' counsel have endeavoured to excite national prejudices, and to cast an odium on the defendants, by representing them as wishing to subject the citizens of this state to the operation of *English* statutes. But, before this Court, such an attempt must be in vain. We rest our defence solely on the law of this state. When the people framed the Constitution under which this Court is now sitting, they adopted the common law of *England*, then existing, as the law of this state, subject to such alterations and modifications as the Legislature might afterwards make. The late Convention, in re-modelling that Constitution, have again adopted the common law of *England*, as it existed here on the 19th of *April*, 1775, subject to the same legislative alteration. If there be any law obligatory on the Court, it must be that which has been engrafted into the Constitution of the state, and which owes its authority to the free choice of the people, expressed by them twice in the most solemn manner. Before our revolution, the *English* Courts were the authoritative expounders of this law ; and their decisions are still obligatory on the Courts of this state ; not because they are *English* decisions, but because the people of this state have so willed it. The decisions of *English* Courts since the revolution, though not binding here, are, nevertheless, to be received as evidence of the law of that country, in like manner, as the opinions of eminent lawyers of any other country would be evidence of the law of such country. If these later decisions have been in perfect accordance with those pronounced anterior to the revolution ; if they are all consistent with each other ; if they are numerous ; if they have been made by different Courts, at different times, and in different parts of the *British* empire, and by lawyers of the greatest learning, talents, and reputation, the presumption that a principle recognised in all of them, is a true and sound principle, is irresistible ; and it is hardly to be supposed, that this Court can be induced, by the arguments of the learned counsel on the other side, to overrule the concurring decisions of Lord *Hardwicke*, Lord *Camden*, Lord *Mansfield*, Lord *Thurlow*, Lord *Loughborough*, Lord *Kenyon*, and Lord *Eldon*, as

not warranted by the common law of *England*. We contend, that by that law, as it existed at the time of our revolution, and adopted here by our Constitution, an assignment of personal property, made by the law of a foreign country, in which the owner is domiciled, will vest in the assignee a title to such property situated in this state. If this position be correct, the plaintiffs cannot recover. They claim no property, except that which belonged to *F. Mullett*, at the time the attachment issued, which was in *August*, 1816. But, if the right to the debt due from *Isaac Clason* to *M.* vested in his assignees, by the assignment made in *February*, 1815, it follows, that it did not belong to him in *August*, 1816. It is of no importance to determine, whether the assignees could sue for the debt in their own names, or whether they would be obliged, as in the case of *Bird and others* v. *Pierpont*, (1 *Johns. Rep.* 118.) to sue in the name of the bankrupt; for it is well settled, (*Jackson* v. *Walworth*, 1 *Johns. Cases*, 372.) that property held in trust by an absent debtor, will not pass to the trustees for his creditors under our act.

In the case of Captain *Wilson*, an *English* bankrupt, decided by Lord *Hardwicke*, in 1755, he held, that an attachment of a debt due to the bankrupt in *Scotland*, subsequently to the bankruptcy, was of no avail, the property being, by the assignment, vested in the assignees under the commission. This case is in point; and it is the stronger, because the Court of Sessions in *Scotland* concurred in opinion with the *English* Court of Chancery. The best account of this case is to be found in the opinion of Lord *Loughborough*, in *Sill* v. *Worswick*; (1 *H. Bl.* 691.) and from what he said, in *Foliot* v. *Ogden*, (1 *H. Bl.* 132.) the decree appears to have been affirmed in the House of Lords.

The case of *Solomons and others* v. *Ross*, (1 *H. Bl.* 131.) was decided in 1764. A bill was filed by *Israel Solomons*, an attorney in fact of the curator of certain *Dutch* bankrupts, in *their names*, and his own, against the defendant, who had attached a debt due to the bankrupt in the Lord Mayor's Court of *London*, and, after judgment upon that attachment, had received the note of the debtor in payment. The money having been brought into Court, it

was decreed, that it should be paid to the attorney of the curators.

In 1764, the case of *Neal and another, assignees of Grattan,* v. *Cottingham and Houghton,* was decided in the Court of Chancery in Ireland. (1 *H. Bl.* 132.) The plaintiffs were assignees of a bankrupt, under an *English* commission. The defendants had attached and recovered in *Ireland* a debt due to the bankrupt. The Court decreed, that the defendants should pay to the assignees the money thus recovered. The reporter adds, as this was the first cause of this kind ever decided in *Ireland,* the Lord Chancellor called in the assistance of several of the Judges; and, after great consideration, with the approbation of the Judges whom he consulted, pronounced a decree in favour of the plaintiffs.

In 1769, the case of *Jollet and Reitveld* v. *Deponthieu and Baril,* (1 *H. Bl.* 132.) came before Lord *Camden.* The plaintiffs were curators of certain *Dutch* bankrupts. The defendant, *Deponthieu,* had attached moneys of the bankrupts, in the hands of the other defendant, *Baril.* The *curators* filed a bill, in their *own names,* to enjoin proceedings on the attachment, and to compel a payment of the money, to themselves, which was decreed, and a perpetual injunction awarded.

In 1779, the case of *Le Chevalier* v. *Lynch,* (1 *Doug.* 169.) came before the Court of K. B. The defendant owed money to a bankrupt, one of whose creditors had attached the debt, in the island of *St. Christophers.* The plaintiff, as assignee of the bankrupt, brought the suit to recover the same debt. Lord *Mansfield* said, " If a bankrupt has money owing to him out of *England,* as in *St. Christophers, Gibraltar,* &c. the assignment under the bankrupt laws, so far vests the right to the money in the assignees, that the debtor shall not turn them round, by saying he is only accountable to the bankrupt. In *Scotland,* they permit assignees of a bankrupt in *England,* to sue for money owing to the bankrupt in *Scotland ;* and it has been determined at the *Cockpit,* upon solemn consideration, that bills by *English* assignees may be maintained in the plantations upon demands due to the bankrupt's estate." It does

not appear, from the report of this case in *Douglas*, whether the debtor had paid the money on the attachment; but this omission is supplied by *Law*, who cites this case, (4 *T. R.* 186.) where it is stated that the money had been paid.

In 1791, the case of *Sill* v. *Worswick*, (1 *H. Bl.* 690.) was decided in the Court of C. P. It was an action by the plaintiff, as assignee of a bankrupt, against the defendant, who, after the assignment, had attached and recovered a debt due to the bankrupt, in the *West Indies*. Judgment was rendered for the money so recovered. And Lord *Loughborough* said, "It is a clear proposition, not only of the law of *England*, but of every country in the world, where law has the semblance of science, that personal property has no locality; but that it is subject to that law which governs the person of the owner. With respect to the disposition of it, with respect to the transmission of it, either by succession, or by the act of the party, it follows the law of the person."—" Personal property, then, being governed by the law which governs the person of the owner, the condition of a bankrupt, by the law of this country, is, that the law, upon the act of bankruptcy being committed, vests his property, upon a just consideration, not as a forfeiture, not on the supposition of a crime committed, not as a penalty, and takes the administration of it, by vesting it in assignees, who apply that property to the just purpose of the equal payment of his debts. If the bankrupt happens to have property which lies out of the jurisdiction of the law of *England*; if the country in which it lies proceeds according to the principles of well regulated justice, there is no doubt but it will give effect to the title of the assignees. The determinations of the Courts of this country have been uniform to admit the title of foreign assignees." The whole of this opinion is important, and shows that Lord *Hardwicke* had held the same doctrine.

In 1791, the case of *Hunter* v. *Potts*, (4 *T. Rep.* 182.) was decided by the K. B. The plaintiff, as assignee of a bankrupt, brought the action against the defendant, who had attached property of the bankrupt, in *Rhode Island*, and thus recovered a debt due to him from the bankrupt. Judgment was given for the plaintiff. Lord *Kenyon* said,

"The only question here is, whether the property in *Rhode Island* passed by the assignment, in the same manner as if the owner (the bankrupt) had assigned it by his voluntary act ; and that it does so pass, cannot be doubted, unless there were some positive law of that country to prevent it." This judgment was affirmed in the Exchequer Chamber, by the opinion of all the Judges, except Ch. Justice *Eyre.* (2 *H. Bl.* 402.)

In *Smith* v. *Buchanan,* (1 *East,* 11.) decided in 1800, Lord *Kenyon* says, " It is true we so far give effect to foreign laws of bankruptcy, as that assignees of bankrupts, deriving title under foreign ordinances, are permitted to sue here for debts due to the bankrupt's estate ; but that is because the right to personal property must be governed by the laws of that country where the owner is domiciled."

The case of the *Bank of Scotland* v. *Assignees of Scott, Smith, Stein & Co.* was decided in the Court of Sessions, in *Scotland,* in 1813. (1 *Rose's Bank. Cases,* 462.) The bankrupts carried on business at *London* and at *Edinburgh.* Three of the partners lived in *London,* and two at *Edinburgh.* A commission of bankrupt issued in *England,* and the bank prayed a *sequestration* in *Scotland,* which was denied, on the ground that all the estate of the bankrupts in *Scotland* was already vested in the assignees under the commission. Lord *Robertson* said, " This is certainly a case of great importance. But it appears to me that we have clear principles of international law to govern our decision : Principles which have been repeatedly recognised by the solemn judgments of this Court, and to which I am of opinion that we ought now to adhere, unless we are to throw into confusion the whole system of our bankrupt law." After noticing some preliminary points, he proceeds—" It is a question of great importance, what is the effect in *Scotland* of an *English* commission of bankrupt. In my opinion, the effect to be given to it in every country where the true principles of international law are understood, is, that it must carry the whole estate of the bankrupt. It is a principle which has been long established, that moveables have no locality. They follow the person of the owner, and their condition is governed by the law of his domicil.

ALBANY,
August, 1822.

HOLMES
v.
REMSEN.

It may be said, that is a fiction, and it is so ; but it is a fiction introduced upon the soundest principles of justice, and in practice has been attended with the most beneficial consequences.    It has been confirmed by repeated decisions, which your Lordships will not now shake.    It follows, clearly, indeed, from attending to the case of transmission of moveables *inter vivos ;* and the doctrine is well laid down by Lord *Loughborough*, who states it, as an undeniable principle of international law, acknowledged wherever law is a science, that moveables have no locality.    As a voluntary conveyance of moveables in *England*, will carry those situate in other countries, so must a commission of bankrupt, issued in *England*, attach the whole effects, wherever situate."

Lord *Meadowbank* said, " Equiparating this case to the ordinary case of transference, by contract of marriage, where a lady of fortune having a great deal of money in *Scotland*, or stock in banks or public companies there, marries in *London*, the whole property is, *ipso jure*, her husband's.    It is assigned to him.    The legal assignment of a marriage operates, without regard to territory, all the world over."

Lord *Bannatyne* observed, " It is a maxim of universal law, that moveables follow the person ; and, therefore, it is clear, that these must be carried, either by the sequestration or by the commission, according as the one or the other is first issued."

Lord Justice *Clerk* said, " We are now to decide the great question, whether a commission of bankrupt, issued with all due form and solemnities in *England*, ought or ought not to carry the estates of parties who have been rendered bankrupt in *England*, but who have effects in *Scotland*. I agree with all the opinions given by your Lordships upon this general point, because I conceive that such opinions are only giving effect to previous solemn judgments."

Again, in *Selkrig* v. *Davies*, which came to the House of Lords, on an appeal from the Court of Sessions of *Scotland*, in 1814, (2 *Rose's Bank. Cases*, 99. 313.) Lord *Eldon* said, " but, notwithstanding that, one thing is quite clear, there is not in any book, any *dictum*, or authority, that would authorize

me to deny, (at least in this place,) that an *English* com= ALBANY,
mission passes (as with respect to a bankrupt and his credi= August, 1822.
tors in *England*) the personal estate he has in *Scotland*, or HOLMES
in any foreign country." And the judgment of the Court v.
of Sessions, which was to the same effect, was affirmed. REMSEN.
In 1815, was decided the case, *Ex parte Cockayne and
others, in the matter of Cliff*, (2 *Rose's Bank. Cases*, 234.)
Certain *Scotch* creditors opposed the granting the bank=
rupt certificate, on the ground that the question of seques=
tration was pending in *Scotland*. The Lord Chancellor
directed the certificate to be allowed, observing, " That the
law was now too well settled, between a sequestration, and
a commission, to authorize the staying of a certificate upon
the ground of a subsequent sequestration."

Thus, there appears to be an uninterrupted series of decisions,
for nearly seventy years, all of them adopting the principle
for which we contend, and applying it to cases like the present.
The *English Judges*, even before our revolution, gave ef=
fect to foreign assignments in bankruptcy, in preference to
subsequent judgments, obtained in their own Courts, by
their own subjects. The *Irish* Judges did the same ; and
the Supreme Court of *Scotland* has since done the same.
All these Courts assert, that their decisions are not only
conformable to the common law of *England*, but to the law
of nations. This Court, as far as it has gone, has proceed=
ed upon the same principle. In *Bird, Savage and Bird
v. Pierpont*, (1 *Johns. Rep.* 118.) the Court took notice of
the rights of foreign assignees, and allowed them to main=
tain an action in the name of the bankrupt. In the case of
*Bird* v. *Caritat*, (2 *Johns. Rep.* 344.) Ch. Justice *Kent* said,
" There can be no doubt of the right of the assignees to
collect the debts due to the bankrupt, either by a suit in
their own names, or as trustees suing in the name of the
bankrupt. It is a principle of general practice among
nations to admit and give effect to the title of foreign as=
signees. This is done on the ground, that the conveyance,
under the bankrupt laws of the country where the owner is
domiciled, is equivalent to a voluntary conveyance by the
bankrupt, and that the general disposition of personal pro=
perty by the owner, in one country, will affect it every

where, because, in respect of the owner's control over it, personal property has no locality."

It has been said, that, by the *English* law, *choses in action* have locality, because they may be *bona notibilia*. But though the Ecclesiastical Courts of that country take notice, in some instances, of the residence of a debtor, for the purpose of ascertaining the proper jurisdiction by which administration is to be granted of the estate of the creditor; yet, even in the interpretation of wills, *choses in action* are not allowed locality. In *Moore* v. *Moore*, (1 *Bro. Ch. Ca.* 127.) a bequest had been made by a testator, of all his goods and chattels in *Suffolk.* The plaintiff claimed a bond under this bequest. Lord Chancellor *Thurlow* held, 1. That the words, "goods and chattels," included *choses in action*, but, 2. That the bond did not pass under the bequest. " *Choses in action,*" said he " have no locality; bonds have no more locality than other *choses in action,* otherwise than by drawing the jurisdiction of the Ecclesiastical Court."

In opposition to this doctrine, there is to be found, the case of *Taylor* v. *Gear and others,* in the Superior Court of *Connecticut,* (*Kirby's Rep.* 311.) In that case, after a verdict for the plaintiff, for a book debt, the defendants moved, in arrest of judgment, because they were uncertificated *English* bankrupts. This extraordinary motion was overruled by the Court, who made the obvious remark, that this fact would constitute no defence, even in *England* ; and that, supposing it to be a good defence, it ought to have been pleaded. But, the Court also said, what the case did not require, that a commission of bankruptcy against the defendant in *England,* did not secure their effects in *Connecticut* ; but that they remained, as before, transferable by them, and open to the attachment of their creditors, as well *British* as *American.* This singular *dictum* is more than countervailed by the opinion of Chief Justice *Parsons,* in *Goodwin* v. *Jones,* (3 *Mass. Rep.* 517.) " It is admitted," he said, " that the assignee of a bankrupt, duly appointed, pursuant to the laws of the state where the bankrupt dwells, may maintain an action, in that character, in any other state, the laws of which are not repugnant to his recovery." And again : " The assignment

of a bankrupt's effects may be considered as his own act, as it is in the execution of laws by which he is bound, he himself being competent to make such assignment, and voluntarily committing the act which authorized the making of it."

In *Harrison* v. *Sterry and others*, (5 *Cranch*, 289.) certain debts due to *Bird, Savage & Bird*, had been attached under a law of *South-Carolina*, in *April*, 1803. A commission of bankruptcy issued against the firm in *England*, in *June*, 1803. The assignees under the *English* commission claimed the debts so attached, and the Supreme Court of the *United States* disallowed their claim. Nothing can be more clear, than that the *subsequent* assignment in *England* could not devest the rights *previously* acquired by the attaching creditors. And Chief Justice *Marshall* disposes of this claim by a bare remark, that the bankrupt law of a foreign country is incapable of operating a legal transfer of property in the *United States*. As far as related to the case before him, the observation was undoubtedly just. But, it is not to be presumed, that this eminent Judge meant to overrule all the authorities which have been cited, without giving a single reason for doing so, or that he intended to decide the general question as to the operation of foreign bankrupt assignments, which had not been argued, and which could not arise in that cause.

In the case of *Burk and others* v. *M'Lain*, (1 *Harris and M'Henry's Rep.* 236.) decided in the Provincial Court of *Maryland*, in 1766, a *British* creditor attached the effects of a *British* bankrupt, in *Maryland*, and the Court set aside the attachment. This is all we know of the decision from the report of the case ; and it is in our favour. There is, however, added to the report, the opinion of *D. Dulaney*, Esq. who seems to think, that an attachment by a *Maryland* creditor would have been good. But, to this opinion, may be opposed that of Lord *Talbot*, given in 1723, and published in *Beawes' Lex Mercatoria*, page 499 ; that the right to the effects of an *English* bankrupt in the plantations, vested in his assignees, although the bankrupt laws did not extend to the plantations, and though his certificate would be no discharge to him there.

ALBANY,
August, 1822.

HOLMES
v.
REMSEN.

The case of *Wallace and others* v. *Patterson and others,* (2 *Harris and M'Henry,* 463.) also arose in a Court in *Maryland.* The only point argued and decided was, that a separate creditor of one of the partners in a firm, might attach his share of a debt due to the firm. The effect of an assignment under a commission of bankruptcy was not discussed. In the case of *Milne* v. *Moreton,* (6 *Binney,* 353.) decided in the Supreme Court of *Pennsylvania,* in 1814, there was no assignment executed by the bankrupt, and it was decided by a majority of the Court, that the attachment, under the law of *Pennsylvania,* which does not resemble our law, should prevail. But to this decision, and to all the *dicta* which may be produced against the defendants, we might fairly oppose the judgment of the Court of Chancery of this state, between the parties now before the Court.

Such are the authorities upon this point, and we trust that we have shown, that by the law of *England,* as adopted by the people of this state, an assignment under a foreign commission of bankruptcy, vests in the assignees a right to the bankrupt's personal effects every where. If such be the law, it is in vain to inquire whether it is politic or expedient. Such questions belong to the Legislature. The duty of Courts is to declare the law, not to make it. It has been said, that the *English* bankrupt acts are penal; and that we ought not to execute the penal laws of another country. This is an error. Those laws do, indeed, impose penalties which are not to be inflicted here; but they are also remedial; and the vesting the estate in trustees for the mutual benefit of the bankrupt and his creditors, is not a penalty imposed, but a remedy provided by those laws. Lord *Loughborough,* in his opinion, already cited, says, that the property is vested in the assignees, upon a just consideration, *not as a forfeiture, not on the supposition of a crime committed, not as a penalty.* And this is undoubtedly true. Before dismissing this point, we must call the attention of the Court once more to the nature of our *absent* debtor act. The opinion of the Court of *Pennsylvania,* turned partly on the fact, that the attaching creditor was an *American* citizen; and the hardship of depriving an *American* citizen of his reme-

dy, is an argument which has been much dwelt on, by the counsel for the plaintiffs. But the creditors for whose benefit an attachment has been issued, and for whom the plaintiffs are trustees, are not *American* citizens. It is for the equal benefit of *all* the creditors of *F. Mullett*, wheresoever they reside; for those who reside in *London*, and have proved their debts, and received dividends under the commission there, no less than for those few who reside here. Neither can it be said, with propriety, that, under our act, a *lien* is obtained upon any particular debt. The act differs wholly from any law concerning attachments, with which we are acquainted. It vests in trustees, *all* the property of the absent debtor, for the benefit of *all* his creditors. It is, in effect, a bankrupt act in every thing but in providing for the debtor's discharge. This view of our act presents, if we are not mistaken, a material difference between the state of facts in this cause, and that in *Milne* v. *Moreton*.

2. But if a right to the debt in question did not pass by the assignment under the commission, it passed by the voluntary assignment of *F. Mullett*, made long previous to the proceedings under our act relative to absent debtors.

In *Milne* v. *Moreton*, Ch. Justice *Tilghman* says, " We have no laws prohibiting foreigners from the free disposal of their personal property situated here. Therefore, if *Topham* (the bankrupt) had made an assignment of his property in the hands of his garnishee, the case would not have admitted of a moment's speculation. For though, in strict law, *a chose in action* is not assignable, yet it is in equity ; and an equitable assignment made *bona fide*, and for a valuable consideration, will be protected against attachment." So that, if that case be against us on one point, it is directly in our favour upon another.

It is, however, objected to this voluntary assignment, that it was made *eodem flatu*, with the assignment of the commissioners. What then ? Supposing the latter to be inoperative here, there is nothing in it so odious and abhorrent to our laws as to poison and contaminate every act done at the same time. If one part of the same instrument may be valid and another invalid, which is often the

case, surely, a good instrument cannot be vitiated, because executed contemporaneously with another which has only a local operation.

It is, also, urged, that this assignment is void, as being made in *fraudem legis* of the state of *New-York*, because, intended to protect the debts assigned from being attached under our law. No such intent can be presumed from the facts in the cause. Nor did any attachment issue until *eighteen* months after the assignment. If this objection be a good one, then every assignment by a foreigner of a debt due from a resident here, will be void ; which will certainly not be contended.

It is further alleged, that this assignment is void under the act for the prevention of frauds. But it has been so often decided that a conveyance in trust for creditors is not avoided by that statute, that it is unnecessary to argue that point.

The only objection to this assignment, which can have any weight, is, that it is void by the bankrupt laws of *England*. But this cannot be urged by the plaintiffs, without giving up their objection to the commissioners' assignment. If the law of *England* is to be noticed for the purpose of annulling one assignment, must it not, also, be recognised to uphold the other ? Are we to give effect to foreign bankrupt laws, so far as they disable debtors from transferring property, and yet refuse to allow them to operate, in validating a transfer ? But how is this transfer invalid by the *English* law ? Merely because there is no subject upon which it can operate. That law considers the whole property of the bankrupt as already transferred by the commissioners' assignment ; and, therefore, they consider his subsequent assignment as ineffectual ; but it is not *prohibited ;* nor could an act, done with the express intent of giving effect to the bankrupt law, be considered, by the Courts of that country, as done in fraud of them. After the first assignment, the right to the debt now demanded was in some person. If it was not in the assignees, it must have remained in the bankrupt. If it was in him, we have no law which forbade him to assign it for the benefit of all his creditors. And he has done so.

3. But, whatever may be the opinion of the Court upon the other points, we insist, with entire confidence, on the third point which we have made : namely, That the defendants, having been once compelled to pay this debt, by the judgment of a Court of competent jurisdiction, cannot, and ought not, to be compelled to pay it over again. ( *Chevalier* v. *Lynch, Doug.* 170. *Allen* v. *Dundas*, 3 *Term Rep.* 129. *Embree* v. *Collins and Hanna*, 5 *Johns. Rep.* 101.) The plaintiffs' counsel, to elude the force of this defence, boldly avers, that the judgment rendered in *London* was fraudulent and collusive    Fraud is odious, and not to be presumed : it must be proved. But the case contains no circumstance which affords ground even for suspicion. There is no apparent motive why the executors of Mr. *Clason* should desire to pay the *English* assignees rather than the plaintiffs. They could make no defence in an *English* Court; but they did no act which facilitated a recovery. Their conduct in continuing one of the first commercial houses in Europe in the agency to which they had been appointed by the testator, was innocent and proper. Nor could their doing so have any effect upon the proceedings under the attachment. Their moneys would have been equally liable to be attached in the hands of any other agent.

Again : It has been said, that the assignment in *England* was made *flagrante bello ;* but, if that were the fact, is not an assignment, or transfer of personal property here, by a person in *England,* during war, valid ?

*Caines,* in reply, said, that it was not true that the plaintiffs were trustees for all the creditors of *Mullett ;* they were so only for such as came in under the attachment. Those creditors who had come in under the *English* commission, could not come in under the attachment here, without bringing in the dividends received under the commission, and renouncing them. Our citizens insist on a preference, in virtue of the attachment law, over the other creditors not coming in under it, but claiming out of another fund. The *American* creditors look to the *American* fund ; the *English* creditors to the *English* fund. When the *American* creditors are

satisfied, the *surplus* will go to the assignees of the bank-rupt, as it would to the bankrupt himself, if there had been no commission issued. In this mode, every comity is ren-dered to the laws of other countries, which the independence of our own laws and judiciary, and the rights of our citi-zens, will warrant.

We admit that the bankrupt assignment passes all the pro-perty of the bankrupt here, and every where; *provided*, al-ways, that there are no creditors here having claims on that property. We admit the right of the assignees of the bank-rupt to collect his property here, and take it to *England*, if there are no creditors of the bankrupt here; but not other-wise. If there are creditors attaching here, there is a *con-flictus legum*, and the foreign law must yield.

PLATT, J. Three points are presented in this case:

1st. Whether the assignment by the commissioners of bankrupt in *England*, (being prior in date,) transferred this *chose in action* to the assignees of the bankrupt, in oppo-sition to the claim of the trustees under the attachment *here*?

2d. Whether (if that statutory assignment was inopera-tive) the assignment made personally by *Mullett* to the same assignees, was effectual, in regard to the debt due from *Clason*?

3d. Whether the payment to the assignees of the bank-rupt in *England*, under the circumstances of the case, is a good defence to this action?

I have read, and studied, with respectful attention, the opinion of his Honour *the Chancellor*, in a case between the same parties, and involving the same questions; (4 *Johns. Ch. Rep.* 460.) and it presents a new occasion to admire the extent and accuracy of his researches, and the liberal prin-ciples of public policy which characterize his decisions. After a luminous review of the cases, authorities, and learn-ed *dicta* on this head, the Chancellor decreed in favour of the defendants, on all the points here stated.

I fully concur with him in opinion, that in respect to the owner's control over it, (during peace,) personal property ought to have no *locality*: and my mind would most wil-

lingly be led to the conclusion, that it would be a just and wise rule of international law, that the sequestration of personal property for the benefit of creditors, which is *prior* in point of time, should attach to itself the distribution of the whole funds, wherever situated. But however fit and convenient such a rule might be for the general interest and security of commerce ; yet, so long as the evil passions and infirmities of our nature remain, I fear it is rather to be desired than expected. To be practicable and just, the rule must not only be reciprocal and universal ; but it must be administered every where, with a liberal equity and an enlightened impartiality, that would inspire universal confidence ; and which, I fear, cannot reasonably be expected, from the variously modified organs of judicial power in different countries.

It is admitted, " that every country may, by positive law, regulate, as it pleases, the disposition of personal property found within it ; and may prefer its own attaching creditor to any foreign assignee ; and no other authority has a right to question the determination." (4 *Johns. Ch. Rep.* 471.) This shows that the liberal rule so ably contended for by our learned Chancellor, and by Lord *Hardwicke,* Justice *Bathurst,* Lord *Camden,* Lord *Thurlow,* Lord *Loughborough,* Lord *Kenyon* and Lord *Eldon,* has not yet ripened into a law, obligatory on the community of nations. (*Sill* v. *Worswick,* 1 *H. Bl.* 691. *Solomons* v. *Ross,* 1 *H. Bl.* 131. note. *Jollett* v. *Deponthieu, &c.* 1 *H. Bl.* 132. note. *Hunter* v. *Potts,* 4 *Durn. and East,* 182. Case *ex parte Blakes,* 1 *Cox,* 398. *Philips* v. *Hunter,* 2 *H. Bl.* 402. *Stein's* case, 1 *Rose's Cases in Bankruptcy, App.* p. 462. *Selkrig* v. *Davis,* 2 *Dow,* 230. 2 *Rose,* 291. *Smith* v. *Buchanan,* 1 *East,* 6. *Neale* v. *Cottingham,* 1 *H. Bl.* 132. note.) In this long list of cases, the *English* Judges have generally advanced gratuitous *dicta,* far beyond what was required to decide the cases before them : and I therefore feel a strong impression, that his honour the Chancellor has allowed to some of them more weight of authority than they merit.

In the case of *Cleve* v. *Mills,* (1 *Cook. B. Laws,* 303. 4 edit.) Lord *Mansfield* held, " That the statutes of bankrupts

do not extend to the colonies; but the assignments under such commissions are considered as voluntary; and, as such, take place between the assignees and the bankrupt; but do not affect the rights of any other creditors."

In the case of *Solomons* v. *Ross*, (1 *H. Bl.* 131. note.) which came before Mr. Justice *Bathurst*, sitting for Lord *Northington*, in 1764, " Messrs. *Deneufvilles*, merchants, at *Amsterdam*, corresponded with *Michael Solomons* and *Hugh Ross*, merchants, of *London*. On the 18th of *December*, 1759, the *Deneufvilles* stopped payment; on the 1st of *January*, 1760, the Chamber of Desolate Estates, in *Amsterdam*, took cognizance thereof, and on the next day, they were declared bankrupts, and curators or assignees appointed of their estates and effects. On the 20th of *December*, 1759, *Ross*, who was a creditor of the bankrupts, to the amount of near £3000, made an affidavit of his debt in the Mayor's Court of *London*, and attached their moneys in the hands of *Michael Solomons*, who was their debtor to the amount of £1200. On the 8th of *March*, 1760, *Ross* obtained judgment, by default, on the attachment, and, thereupon, a writ of execution issued against *Michael Solomons*, who was taken in execution, but being unable to pay the £1200, gave *Ross* his note, payable in a month; on which *Ross* caused satisfaction to be entered on the record of the judgment.

" A few days after, one *Israel Solomons*, who had a power of attorney from the curators to act for them in *England*, filed a bill, making himself and the curators plaintiffs, praying that the defendant, *Michael Solomons*, might account with them for the effects of the bankrupts, which were in his hands, might pay and deliver the same over to *Israel Solomons*, for the use of the curators, and be restrained from paying or delivering them over to *Ross*.

" *Michael Solomons* then filed a bill, by way of interpleader, praying an injunction, and that he might be at liberty to bring the £1200 into Court. This money was accordingly paid into the bank, in the name of the Accountant General, pursuant to an order of the Court.

" The decree directed, *inter alia*, that the stock purchased with the money paid into the bank, should be transfer-

ted to *Israel Solomons*, for the *benefit of the creditors of the bankrupts*, and that *Ross* should deliver up the note given by *Michael Solomons*, for £1200, to be cancelled."

In *Jollet, &c.* v. *Deponthieu and Baril*, before Lord *Camden*, in 1769, (1 *H. Bl.* 132. note.) *Deneufvilles*, merchants, at *Amsterdam*, stopped payment on the 30th of *July*, 1763. On the 8th of *October* following, the plaintiffs were appointed curators of their effects; and the bankrupts owed the defendant, *Deponthieu*, of *London*. On the 5th of *January*, 1764, the defendant, *Deponthieu*, attached the money of the bankrupts in the hands of *Baril*, a debtor of the bankrupts. Pending the attachment, the curators filed their bill for an account between the bankrupts and *Baril*; and that the balance might be paid to them, and the defendant, *Deponthieu*, be restrained from proceeding on the attachment. The decree was, " that the plaintiffs recover the balance due ; and that a perpetual injunction issue against proceeding on the attachment."

In the case of *Mowdesley* v. *Parke and Beckwith*, (*Lincoln's Inn Hall*, 1779, before Lords Commissioners *Smythe* and *Bathurst*, 1 *H. Bl.* 680, as stated by Serjeant *Hill*, without contradiction, in *Sill* v. *Worswick*,) " the defendants were assignees under a commission of bankrupt against *Campbell and Hayes*; and, after the assignment to them from the commissioners, several of the bankrupt's creditors, in *Rhode Island*, attached a debt due from the plaintiff to the bankrupt, in pursuance of an act of Assembly there, authorizing such process. The plaintiff coming to *England*, the assignees brought an action at law against him, and the bill was filed for an injunction, the plaintiff offering to pay what (if any thing) should appear to be due to the assignees, after deducting what should be recovered against him by the plaintiffs in the foreign attachment. The assignees, by their answer, insisted, that the property of the bankrupts was vested in them before the writs were served on the plaintiff, and, therefore, that he had no money or effects belonging to the bankrupts in his hands, and, consequently, that the plaintiffs in those writs were not entitled to recover any thing. An injunction had been granted, and, on showing cause why it should not be dissolved, the Lords Commis-

sioners, *Smythe* and *Bathurst,* continued the injunction to the hearing, and refused to order the plaintiff to bring the money into Court, but directed that he should give security, to be approved of by the master, to pay the defendants what (if any thing) should be decreed to be due; and they were of opinion, that the assignment *did not devest the property out of the bankrupts,* as the debt was due in the plantations, but only gave the assignees a *right to sue for it;* that the creditors *there* had also a right to sue for it, who, having commenced a suit first, and recovered judgment there, *had gained a priority* over the defendants; though it was admitted, that there had been two cases, one determined by Mr. Justice *Bathurst,* sitting for Lord *Northington,* the other by Lord *Camden,* where commissions of bankrupts were issued in *Holland,* and some of the bankrupt's effects attached in *London,* and the attachments were ordered to be discharged, and the money or effects paid to the assignees; and though it was argued by the counsel for the defendants, that the rule in that respect ought to be reciprocal, yet, it was answered, that the *bankrupt laws were not received in the plantations,* and, therefore, this case was not like those two which were mentioned, there being bankrupt laws in *Holland.*"

It is important to remark here, that as Mr. Justice *Bathurst* decided the case of *Solomons* v. *Ross,* in 1764, he must have considered it inapplicable to the case of *Mawdesley* v. *Parke, &c.* which was also decided by him, in 1779. Perhaps, he may have been influenced by the consideration, that between *Holland* and *England* there was a near vicinity; and, what is of more importance, that a complete reciprocity existed as to the remedy; because, a bankrupt law existed in both countries.

*Solomons* v. *Ross,* and *Jollett* v. *Deponthieu,* are the only cases in which the *English* Courts have awarded the benefit of this rule to any other than *British* subjects; and it is to be lamented, that the meagre reports of those cases contain " merely dry decisions, unaccompanied with argument or illustration."

Lord *Kames,* in his " *Principles of Equity,*" written in 1766, (b. 3. c. 8. s. 6. p. 573. 4th edit.) discussing the very

question, as to the extent and effect of the *English* bankrupt laws, says, " Law cannot force the will, nor compel any man to make a conveyance. In place of a voluntary convey- ance, when justice requires it to be granted, all that the Legislature can do, is to be themselves the disponers; and it is evident, that their deed of conveyance cannot reach any subject, real or personal, but what is within their territory. This makes a solid difference between a *voluntary* and a *legal* conveyance. The former has no relation to place ; the latter, on the contrary, has the strictest relation to place, and reaches not lands nor moveables *extra territorium.* We may, then, with certainty, conclude, that the statutory transference of property from the bankrupt to the commis- sioners, cannot carry any effects in *Scotland ;* these are subjected to our own laws, and our own Judges ; and can- not be conveyed from one person to another, by the autho- rity of any foreign statute. The *English* bankrupt sta- tutes, however, are not disregarded by us."

It seems to me, that the true principle is, that the assignees of a bankrupt are in the same, and no better situation, than the bankrupt himself, in regard to foreign debts. They take, subject to every equity, and subject to the remedies provided by the laws of the foreign country where the debt is due ; and when permitted to sue in a foreign country, it is not as assignees having an interest, but as *representatives* of the bankrupt. The law of the domicil having sequestered the bankrupt's estate, so as to devest him of the control over it, and appointed them to administer it, they stand here on the footing of administrators, merely ; with a right of suing, in common with other creditors; but our law will not regard the *chose in action* as exclusively appropriated to their use ; and the preference can only be gained by pur- suing the remedies which our laws afford. This rule was exemplified in the case of *Mawdesley* v. *Parke and Beckwith,* before cited. The assignees of the *English* bankrupt are to be regarded as standing in the shoes of the bankrupt : and if *Mullett* had himself brought this suit, the attachment would certainly be a bar to his claim.

In the case of *Bird, &c.* v. *Caritat,* (2 *Johns. Rep.* 342.) it was decided, that the assignees of an *English* bankrupt

could maintain a suit here, in the name of the bankrupt; and that case did not require a decision on the point now before us.

It is a principle universally acknowledged, that a discharge of a bankrupt, or insolvent debtor, affords no relief from his foreign debts : It has no effect beyond the jurisdiction where it is granted. (*Quin* v. *O'Keeff*, 2 *H. Bl.* 553. *Pedder* v. *M'Master*, 8 *Term Rep.* 609. *Smith* v. *Buchanan*, 1 *East's Rep.* 6. *Proctor* v. *Moor*, 1 *Mass. Rep.* 198. *Van Raugh* v. *Van Arsdaln*, 3 *Caines' Rep.* 154. *Smith* v. *Smith*, 2 *Johns. Rep.* 235.) It seems, therefore, unequal and inconsistent, to give such effect to the bankrupt system of any country, as to strip the bankrupt of all his personal property and *choses in action*, in a foreign country, and yet leave him bound for all that he owes abroad.

The *English* bankrupt law is, in its nature and origin, *penal :* against every person who commits an act of bankruptcy, it denounces that he shall, *ipso facto*, be devested of all his estate ; and, according to the genius of the system, and the practice under it, the proceedings are strictly *in invitum.* Our " act for giving relief in cases of insolvency," is entirely different in its character. In theory and practice, it is a remedy voluntarily resorted to by the *debtor*, to obtain a discharge, upon a *cessio bonorum.* His honour the Chancellor, says, (*Holmes* v. *Remsen*,) " we are bound to give effect to the assignment, because it is equivalent to a voluntary act of the party over his own property," &c. " Every man's assent is to be presumed to a statute :" and he adopts the language of Chief Justice *Parsons*, (*Goodwin* v. *Jones*, 3 *Mass. Rep.* 517.) that " he considered the assignment under the bankrupt laws as the party's own act, since it was in execution of laws by which he was bound, and since he voluntarily committed the act which authorized the making of it." But, with great respect, it appears to me, that it would be unwise and unsafe to extend this doctrine so far. May it not, with equal justice, be said, that, if an *Englishman* commits an act of treason, the consequent forfeiture of his estate shall be deemed equivalent, *here*, to his own voluntary transfer ; because he spontaneously did

the act, which, according to the laws of his country, worked the forfeiture?

As to the acts of governments, generally, throughout the world, such reasoning should be sparingly indulged. It may easily be pushed to an extreme that would be cruel and absurd.

The maxim that " every man is presumed to be assenting, and a party to, the laws of his own country," may be *just*, or *unjust*, according to its application. When applied to *Mullett*, the *English* bankrupt, and to his *English* creditors, it is just and proper; but, in my judgment, it is not applicable to creditors who owe no allegiance to *Great Britain*; who have not, in any sense, actually or virtually assented to her laws; and who ask nothing of her tribunals. National comity requires no more, than that we should lend our aid in giving effect to such assignments, so far as may be done without impairing the remedies, or lessening the securities, which our laws have provided for our own citizens. " *Apices juris non sunt jura.*"

The *point decided* in the case of *Sill* v. *Worswick*, (1 H. Bl. 665.) extended no further than what I here concede; namely: That an *English* creditor, after an act of bankruptcy, cannot attach, in a foreign country, money due to the bankrupt, without being liable to refund it to the assignees. It was a question between *British subjects* all round: and a *British* Court treated them as parties, who had virtually assented to, and were bound by the act of their own government. I admit, however, that the reasoning of Lord *Loughborough* in support of that decision, embraced a wider scope. Lord *Loughborough*, in that case, (page 693.) says, " The Court of *St. Christopher's* ought, unquestionably, to have preferred the title of the assignees, to the title of the creditor using the process of attachment, *because the law of the country, to which the creditor making the demand was subject,* had vested that property in the plaintiffs."

The case of *Philips* v. *Hunter*, (2 H. Bl. 402.) before all the Judges in the *Exchequer Chamber*, was also a question as to the effect of the *English* bankrupt law *between British subjects.* The case of *Hunter* v. *Potts*, (4 T. R.

182.) is of the same character; the parties being all *British* subjects. I admit, without doubt or scruple, that these cases were all rightly decided : but so far as the reasoning and illustrations of those learned Judges transcended the cases before them, with a view to establish a favourite theory, I enter my humble dissent.

As was well observed by Mr. Justice *Yeates*, in *Milne* v. *Moreton*, (6 *Bin*. 369.) "It is one thing to assert, that assignees of bankrupts under foreign institutions should be allowed, by the courtesy of nations, to support suits, as representatives of such bankrupts, for debts due to them ; and it is another thing to give efficacy to those institutions, to cut out attaching creditors, although posterior in point of time, who have commenced their proceedings under the known laws of the government to which they owed allegiance, and from which they were entitled to protection."

It is important to bear in mind, that the rule contended for by the Courts in *England* and *Ireland* is, that under a commission of bankrupt, *the property passes by relation to the act of bankruptcy.* In that respect, Chancellor *Kent* admits, that in *Solomons* v. *Ross*, "the application of the rule was pushed too far." And he also protests against the same extension of the rule in *Neal* v. *Cottingham ;* for it gave effect (he says) to the title of the assignees by relation back, beyond the time of their appointment, to the time of the act of bankruptcy committed ; and so overreached the time of the attachment." And he says, " This doctrine of relation is a positive rule of *mere municipal policy*, which no other country is bound to adopt ; as it would lead to great inconvenience," &c. I confess, I do not see on what principle we can adopt or reject the rule, *by halves*. It is a wise and essential provision of the bankrupt law, that it shall operate by relation to the act of bankruptcy ; without which, the benefits of that law could not be secured ; and every other part of the system, to my apprehension, is equally "of mere municipal policy." If we acknowledge it as a binding rule in any respect, I prefer to adopt it in all its parts ; because I think it more just and equal with that feature, than without it. If foreign Courts exercise the right of modifying the *English* bankrupt law, by rejecting

that part of it ; they necessarily introduce prolixity and confusion. It would open a door to fraud and unjust preferences by the bankrupt ; and would require a different rule of distribution, as between *foreign* and *domestic* creditors. How do we know that *Great Britain* will accede to this *provisional* ratification of the rule ? If the municipal law of the *domicil*, in regard to the rights of creditors, and the distribution of the fund, is not to be the sole and uniform standard ; it seems to follow, that there is no *international* rule on the subject : for if *we* have the right thus to modify it in one feature, every other country has an equal right to amend it in other particulars. It is this discretionary power in a foreign Court, to judge of the fitness of the municipal law of the *domicil*, (which is claimed by his honour the Chancellor,) that will, in my judgment, render it impracticable to establish such a rule in the community of sovereigns.

Mr. *Rose* terms the rule of comity, as acknowledged in *England*, " *international bankrupt law.*" But his honour the Chancellor, more cautiously, and, I think, more correctly, says, " The rule is, that *comity* is to be observed, *quatenus sine prejudicio indulgentium fieri potest.*" After all, it is mere *comity ;* not *international law.* As a general proposition, I would extend this comity to every nation, whose system of jurisprudence, and whose local vicinity, give assurance that it will be reciprocated with fidelity and convenience. But the relative condition of nations is so various and so variable ; the interruptions by wars and embargoes are so frequent ; and the remedies against bankrupt and absconding debtors are so divers and unequal in various countries, as to render this rule of comity extremely difficult in its application. For instance, there are no countries more alike in their principles of jurisprudence, and their commercial habits, than *Great Britain* and the *United States ;* and none, where this rule of comity would be more easy or more equal in its application : and yet the mere fact, that in *one* there is a bankrupt law, and in the *other* none, destroys, in a great degree, the equality and reciprocity of such a rule. The advantage is greatly in favour of *Great Britain*, because our foreign attachment

laws are much more limited in their objects and extent than the *English* system of bankruptcy. *There,* if a merchant or trader commits an act of bankruptcy, a creditor may sue out a commission, and (according to this rule) devest the debtor of all his personal estate· in this country, and appropriate it to the payment of all his debts : but if a bankrupt merchant, resident in *New-York,* were proprietor of millions of personal property in *England,* our laws afford no means for sequestering such property,for the payment of his debts ; although, perhaps, all his creditors reside in this state. It is plain, therefore, that if *Great Britain,* by issuing a commission against a bankrupt merchant of *London,* can spring a net, which shall cover all the effects of such bankrupt throughout the world, and draw them all to her own forum, for distribution, it is, in her hands, a powerful commercial engine, which no other nation has the means of counteracting. In regard to attachment laws, *Great Britain* has equal and similar weapons with our own. Besides, the fact cannot be disguised, that *Great Britain* having the most extended commerce, and her merchants and manufacturers, *crediting* abroad vastly more than they *owe* to foreign creditors, has a strong and peculiar interest in contending for a rule, which draws to herself the distribution of all the effects which her lucrative commerce has dispersed over the globe. Suppose a commission of bankrupt had been issued, and an assignment made by the commissioners in *England,* one month before a declaration of war between that country and the *United States,* what would be the condition of the bankrupt's property, and of his creditors in this country, if that rule be acknowledged ? Must the *American* creditors be told, you cannot attach, because the assignees in *England* are the vested owners ; and as the war forbids them to sue, or to come here to protect the property, therefore, let it rot or be wasted ; when the war ends, you may go to *England* and prove your debts, and look for dividends.

In my judgment, the most convenient and practical rule is, that *statutory assignments,* as to creditors, shall operate *intra territorium* only. If our citizens conduct themselves with a reference to our own laws, in regard to the property

of their debtors *found within our jurisdiction*, it seems reasonable that they should reap the fruits which those laws promise to them. This forms a standard of private rights, which all can easily understand and conform to ; but if an attachment against an absent debtor's property found *here*, may be superseded by a statutory assignment, previously made at *St. Petersburgh* or *Calcutta*, where the debtor resides, the remedy offered by our statute becomes illusory and hazardous. Let each government, in such cases, sequester and distribute the funds within its jurisdiction, and the general result will be favourable to the interests of creditors and to the harmony of nations.

It is an established and universal rule, that, independent of express municipal law, personal property of foreigners dying *testate* or *intestate*, has *locality*. Administration must be granted, and distribution made, in the country where the property is found ; and as to *creditors*, the *lex rei sitæ* prevails against the law of the *domicil*, in regard to the rule of preferences. In principle, I can perceive no substantial difference between that case and the present. Why should not a liberal *comity*, also, demand that the first grant of letters of administration should draw to it the distribution, *among creditors*, of the whole assets, wherever situated ? The plausible reason for the distinction may be, that the interests of commerce require a discrimination in favour of the assignees of bankrupts. But, in practice, I believe it will be found, that commerce is equally affected by the rule in both cases ; because the rule, in either case, can seldom be applied, except to *merchants* and *traders* ; and whether administration be committed to the executors or administrators of a dead man, or to the assignees of a bankrupt, is not very important as to the point before us. Anomalies are inconvenient in the law, and should not be allowed without strong reason.

In deciding this question, it is an important consideration, as a matter of fact, besides the deference and respect due to those tribunals, that the Supreme Court of *Pennsylvania*, the Superior Court of *Connecticut*, the General Court and Court of Appeals of *Maryland*, and the Supreme Court of the *United States*, have decided against the rule of comity

claimed by the *English* Courts. (*Milne* v. *Moreton*, 6 *Bin.* *Rep.* 353. *Taylor* v. *Gear*, 1 *Kirb. Rep.* 313. *Wallis, &c.* v. *Patterson, &c.* 2 *Harris and M'Henry*, 463. See, also, *Bush* v. *M'Lain*, 1 *Harris and M'Henry*, 236. Opinion of Mr. *Dulany*, in 1766. *Harrison* v. *Sterry*, 5 *Cranch* 289.) Chief Justice *Marshall*, on this point, merely says, " The bankrupt law of a foreign country is incapable of operating a legal transfer of property in the *United States*." The subject was worthy of the powerful mind of that venerable and enlightened Jurist; and, with the *Chancellor*, I regret, " that a litigated point of law, of great importance," should have been settled " by a dry decision, unaccompanied with argument or illustration." It was, however, a point necessary to the decision of the case ; and we are not at liberty to re- gard the opinion as *obiter dictum*. I am not aware of a contrary decision in any of our sister states ; and, so long as our supreme national tribunal (to which all aliens, and all citizens of other states in the union, may compel a re- sort) denies to *Great-Britain* the comity which she has ten- dered to us, it can hardly be expected, that a discrimination will hereafter be made by the *English* Courts, in favour of the state of *New-York*, even if the supreme judicial tri- bunal of this state should accede to the rule of *Westminster Hall*.

Upon the whole, I am of opinion, that although such a rule of comity between *England, Scotland* and *Ireland ;* and, also, between the states of our confederacy, may be convenient, and of easy application ; yet, as between inde- pendent nations, it is so unstable and precarious, and sub- ject to so many qualifications, and liable to so frequent in- terruptions, and necessarily involves a discretion so large, and so delicate, as to forbid a reasonable hope, that it can ever form a solid basis for private rights. Besides, the *ex- pense* and delay of going abroad to prove debts, and to claim dividends, may be extremely inconvenient ; and, during wars and embargoes, (so frequent in many countries,) such intercourse would be unlawful. If it be an advanta- geous rule, let it be the subject of treaty ; and then our rights will not depend on the undefinable and capricious theory of *judicial comity*, but on the force of positive obli- gation. I do not mean, however, to suggest a doubt, but

that, independent of the statutory transfer, a *bona fide* assignment, for valuable consideration, or for payment of debts, freely made by such foreign creditor himself, would be valid against a subsequent attachment here; nor do I mean to question the settled principle of national jurisprudence, by which the succession to, and disposition of personal property, is regulated by the law of the owner's *domicil*, in regard to testamentary bequests, and the succession to the *personal* estates of intestates; and I admit, that the same general law governs the rights of the marriage contract. In the impressive language of Lord *Ellenborough*, (5 *East's Rep*. 131.) let it be re-echoed across the *Atlantic*, that these rights have *here* "been long settled in principle, and laid up amongst our acknowledged rules of jurisprudence." But these rights depend on a principle of public policy, which does not apply to, and which can never come in conflict with *creditors*, against whom, the claimants last referred to, have no rights, at home or abroad.

2. The next question is, whether the assignment made personally, by *Mullett*, after the commission of bankruptcy, was effectual to transfer this *chose in action* to the assignees? In the first place, I doubt its validity, because, it was merely collateral to the proceedings under the commission, and was, in some degree, compulsory. But, there is a stronger ground of objection. I admit that, as between the bankrupt, and his assignees, and *English* creditors, they are all bound by the law of their own country; and, although I deny the effect of the statutory assignment, to create a *lien* here, so as to deprive *American* creditors of their remedy, by attachment, under our laws; yet, it seems to me, that the bankrupt, *M*., by the law of his *domicil*, was incapacitated to make any assignment, after the act of bankruptcy for which the commission issued; as to him, all his personal property and *choses in action*, throughout the world, and his power over it, were taken away; and the assignees under the commission, were substituted in his stead. It was in the nature of administration granted on the estate of a man who, in regard to his property, was *civilly dead*. I deny the *lien* or *preference* here, by virtue of that statutory assignment; but freely admit the right of those assignees to

sue here, by virtue of the commission, or *authorization* in *England ;* (requiring them, perhaps, to use the name of the bankrupt ;) and we would not allow the bankrupt to release the debt, or to thwart or defeat the suit of the assignees. My opinion, therefore, is, that the assignment made, *personally*, by *Mullett*, after the commission of bankrupt, was a mere nullity. The law of his *domicil* had deprived him of all power and control over his property, and had appointed administrators in his stead. To test this position, suppose, instead of an assignment made personally by him to the assignees under the commission, as in this case, *Mullett* had made a similar assignment to any other person ; I cannot entertain a doubt, that, in such case, we should respect and allow the title of the statute-assignees, so far as to permit them to sue for and recover the *chose in action* here, in opposition to any other assignee whom the bankrupt might appoint. My opinion on this point, therefore, is, that the assignment personally made by *M.*, after the commission of bankrupt, added nothing to the title of the assignees ; because, he was, by virtue of the bankrupt laws, rendered incapable of making any transfer of his property.

3. But on the last point in this case, I fully concur with his honour the Chancellor, that the payment of the debt in *England*, by the agents of the defendants, being compulsory, and by the judgment of a Court of competent jurisdiction, is a bar to this action for the same debt ; assuming, as I do, that the payment was *bona fide*, and that the funds were not transferred to *England*, for the purpose of evading payment here. Of such collusion, the case presents no shadow of proof. (*Chevalier* v. *Lynch, Doug.* 170. *Allen* v. *Dundas,* 3 *Term Rep.* 139. *M'Daniel* v. *Hughes,* 3 *East,* 367. *Embree* v. *Collins and Hanna,* 5 *Johns. Rep.* 101.)

This last point being decisive of the whole case, my conclusion accordingly is, that the defendants are entitled to judgment.

SPENCER, Ch. J., YATES, J., and WOODWORTH, J., concurred in opinion, that judgment ought to be entered for the defendants, on the ground, that the compulsory payment in

*England* was a good defence in this action; but they declined expressing any opinion on the other points in the case.

Judgment for the defendants.