Varnum *v.* Camp.

JOSEPH B. VARNUM v. JOSEPH W. CAMP.

An assignment of the real and personal property of the assignor, in trust, to defray the expenses attendant upon the execution of the trust, and thereafter to apply the proceeds to secure and prefer a favored creditor, and then to divide among his other creditors, in full or *pro rata*, as the case may be, and to return the surplus, if any, to the assignor, is illegal. To make an assignment valid, under the act, *Rev. Laws*, 674, *sec.* 1, two things are essential. 1. That it should be for the equal benefit of the creditors ; 2. That it creates no preference.

An instrument legal, where made, and at the domicil of the maker, and efficient to transfer his property there, cannot dispose of his moveables, situate here in a manner prohibited by our law, inconsistent with its policy and declared by it fraudulent and void.

The general principle of law, that personal property has no locality, but is transferable according to the laws of the country where the owner is domiciled, is not without its exceptions, or limitations. Hence, though the contract may be valid in New York, yet it is not valid here if it is condemned by a positive statute, and inconsistent with its obvious policy. So in cases of intestacy, in which, though the property is distributed according to the law of the domicil of the intestate, yet so far as concerns creditors, it depends on the law of the country where it is situated.

This was an action of replevin brought in this court by Joseph B. Varnum, against Joseph W. Camp. The cause was tried at the Essex circuit, before the late Chief Justice, and a verdict taken for the plaintiff, subject to the opinion of the court at bar, upon the questions of law arising from the evidence given at the trial. The cause was submitted to the court upon the written arguments of the counsel of the parties.

*E. B. D. Ogden* and *Hornblower*, for plaintiff.

*Cassedy, Dickerson* and *Frelinghuysen*, for defendant.

BY THE COURT. A verdict was in this case taken for the plaintiff subject to the opinion of this court, upon the questions of law arising from the evidence given at the trial.

The action is in replevin for sundry articles of merchandize. Both parties admit, that on and before the first day of December 1828, these articles belonged to William Roy, and were in his possession in a store kept by him at Paterson, in the county of Essex. The defendant, who was sheriff of that county, on the 7th February, 1829, took them in virtue of an execution sued out on a judgment of that date, in favor of William Swan and James Anderson, against William Roy; to whom as the sheriff alleges, the merchandize then belonged. The plaintiff insists.

Varnum v. Camp.

that he, and not Roy, was then the owner, and that he became so on the first day of the preceding December by means of an assignment from Roy, whereby the property was legally transferred to him, and which was, he says, immediately followed by a change of the possession.

The question as to the change of possession may be postponed until we shall have enquired into the validity of the transfer, and will then only become material if the assignment is legal and effectual, for if fraudulent and void, and if thereby no property vested in the plaintiff, the actual possession of the articles by him would not have prevented the seizure and occupation of them by the sheriff.

The validity, operation and effect of the assignment, form the prominent and principal question in the cause.

This instrument was executed in the City of New York, where Varnum and Roy were at the time resident merchants, the latter also carrying on the store at Paterson, by the agency of a clerk, and by his own occasional attendance. It bears date, December 1, 1828. The object expressed on the face of it is to benefit his creditors and for the payment of his debts. It purports to convey all his estate real and personal, especially mentioning among other things, the goods in the store at Paterson, to Joseph B. Varnum, in trust, to defray the expenses attendant upon the execution of the trust, and thereafter to apply the proceeds and avails, by taking up and paying certain specified notes indorsed by John Laroque, and any other notes, if any should be drawn by Roy and endorsed by Laroque, and against which notes Varnum had by a bond of the same date engaged to indemnify Laroque, who had lent his notes and endorsements to Roy for his accommodation, or in other words to secure and perform payment out of his estate, to Laroque a favored creditor, and then to divide among his other creditors, in full or *pro rata*, as the case might be, and to return the surplus, if any, to Roy.

At the outset of our enquiry, I premise that I shall undertake it under a belief there is no actual fraud in any part of the transactions necessary to be examined. I find none, nor any grounds from which, as I apprehend, an inference of such fraud could justly be drawn by a jury. The plaintiffs brief seems indirectly (in a parenthesis) to question whether the judgment of Swan and

Varnum *v.* Camp.

Anderson was not by Roy's procurement, or by collusion with him. There is nothing, however, which I can discern in the evidence to support a suspicion of this kind, and they are acknowledged creditors to very nearly the amount of their judgment, in the schedule made by Roy and accepted by Varnum. In the assignment and matter connected with it, I can discover neither actual or attempted fraud. The declared purpose, the payment of just debts, was laudable, and a sufficient motive and consideration. Varnum himself was a large creditor, and his individual debt was placed not in preference but on a footing with others. And in the result it appears probable he will incur a loss beyond the amount of his original debt, whatever may be the termination of the present suit.

It may also be assumed, for so both parties indirectly, if not explicitly admit, that the assignment in New York, where it was made and where Roy as already remarked then resided, is legal and valid, and is effectual to convey and transfer to Varnum all the property mentioned in it then within the bounds or jurisdiction of that state. I entertain no doubt that such is the settled law there. 2 *Kent. Com.* 429; *Mackie* v. *Cairns,* 5 *Cowen* 547.

But by the law of New Jersey, an assignment like the present is, as respects creditors, not parties, illegal, invalid and ineffectual, to divest the property of the grantor, or to transfer and convey an available interest to the grantee. Our statute enacts, that every conveyance or assignment made by a debtor of his estate, real or personal, or both, in trust to the assignee or assignees for the creditors of such debtor, shall be made for their equal benefit, in proportion to their several demands to the nett amount that shall come to the hands of the assignee or assignees for distribution, and all preferences of one creditor over the other, or whereby any one or more shall be first paid or have a greater proportion in respect of his, her, or their claim, than another, shall be deemed fraudulent and void, except mortgage or judgment creditors, when the judgment has not been by confession for the purpose of preferring creditors. *Rev. Laws* 674, *sec.* 1. To make a valid assignment then under the influence of this statute, two things are essential. 1. That it should be for the equal benefit of the creditors, for the statute directs that it shall be so made; and 2d, that it creates no preference, for all preferences are declared fraudulent and void, and conse-

Varnum *v.* Camp.

quently the instrument, whereby they are attempted must be of the like character.

The position of the plaintiff's counsel, " that the statute does not declare assignments not made according to its provisions to be void, but affirms the assignment, declares what shall be the effect of it notwithstanding its provisions and only makes void so much of it as gives a preference except to mortgages and judgments," cannot be sound. The statute declares how they shall be made, that is to say, for the equal benefit of the creditors, and not merely that such shall be their effect in what way soever made. An assignment therefore made in a manner prohibited and forbidden must be invalid. The express denial of preferences, is in truth but an amplification of the antecedent clause of the statute, and without really adding anything to its extent or perhaps to its force, serves to express in distinct terms the legal effect and operation of that prior clause. It follows then that were an assignment not made for the equal benefit of the creditors, but whereby a preference is sought to be given to any one not a creditor by mortgage or judgment, over another, is in contemplation of law, fraudulent and void. However clear then it may be of moral turpitude, or actual fraud, it can no more, than if thus tainted, prevail against an execution creditor.

In this view of the case then, the question is presented whether an instrument legal where made, and at the domicil of the maker and efficient to transfer his property there, can dispose of his moveables situate here, in a manner prohibited by our law, inconsistent with its policy, and declared by it fraudulent and void.

The general principle is fully and unequivocally settled. Personal property has no locality, but is transferable according to the law of the country where the owner is domiciled; and if there is no exception, or no exception which can reach the articles of merchandize now in question, they become by the assignment the property of Varnum the present plaintiff, and the defence of the sheriff must fail.

But there are exceptions within which the present case will be found, or perhaps more correctly speaking, the principle carries with it such limitations as to preclude the transfer by the assignment of the property in question, so far at least as

respects the claim now fastened on it by the execution of Swan and Anderson.    Chancellor Kent, in his commentaries states the doctrine in these words.   *Locus regit actum,* and by the law of nations, every personal contract which is valid where it was made, is valid every where, unless condemned by some positive regulation of the state, or some strong rule of public policy. 3 *Kent. Com.* 48.  According then to this enlightened jurist, the contract though valid in New York, is not valid here, if as I have endeavored to shew, it is condemned by a positive statute and inconsistent with its obvious policy.

In *Holmes* v. *Remsen,* 20 *John.* 255, *Platt, J.* although differing materially from Chancellor Kent in the extent of the general rule of international law, expressly recognizes and adopts the doctrine laid down by the latter in 4 *John. Ch. Rep.* 471. "Every country may by positive law regulate, as it pleases the disposition of personal property found within it and may prefer its own attaching creditor to any foreign assignee and no other authority has a right to question the determination."   In another place Justice Platt says, *(Ibid* 265) " It is an established and universal rule, that independent of express municipal law, (whereby we are to understand him, when it exists, the subject is to be regulated) personal property of foreigners, dying testate or intestate, has locality.    Administration must be governed and distribution made, in the country where the property is found ; and as to creditors, the *lex rei sitœ* prevails against the law of the domicil in regard to the rule of preferences.    In *Holmes* v. *Remsen,* 4 *John. Ch. Rep,* 471 ; *Ch. Kent,* while maintaining with his wonted strength, an extension of the rule of international law, which he afterwards in his commentaries admits is inconsistent with the weight of American authority, 2 *Com.* 330, steadily qualifies the rule in the manner already shewn in another passage just quoted from the latter work.    Thus he says, the true question is whether it will not be wise, and politic and just where no positive law intervenes, and where it is not repugnant to the essential policy and institutions of the country, to adopt the rule which other nations apply to us, and which impairs nought, but promotes general justice."    And again in another place. " Perhaps we may say, that no concession ought to be made to foreign interests, which would materially dis-

Varnum *v.* Camp.

turb the whole order and policy of our internal arrangements. The rule is that *comitas* is to be observed *quatenus sine præ judicio indulgentium fieri potest.*" In *Milne* v. *Moreton,* 6 *Binney* 361, C. J. Tilghman said, " this proposition is true in general, but not to its utmost extent, nor without several exceptions. In one sense, personal property has locality, that is to say, if tangible, it has a place in which it is situated, and if invisible, consisting of debts, it may be said to be in the place where the debtor resides ; and of these circumstances the most liberal nations have taken advantage, by making such property subject to regulations which suit their own convenience." Every country has the right of regulating the transfer of all personal property within its territory; but when no positive regulation exists, the owner transfers it at his pleasure. In the same case, Judge Breckenridge, who was willing to yield greater efficacy than the rest of the court, to an assignment under the English bankrupt laws, nevertheless thus speaks—" An interest arising on a contract here, unless there is some law with us to exclude it, follows the persons as much as the ownership of a chattel.

The same general doctrine, differing only in terms, is laid down by Justice Story in *Le Roy* v. *Crowninshield,* 2 *Mason,* 157, and by Justice Washington, in *Ogden* v. *Saunders,* 12 *Wheat.* 259. The former says personal contracts are to have the same validity, interpretation and obligatory force in every other country which they have in the country where they are made, or are to be executed. An exception coeval with the rule itself, and resting on the same foundation, is that no nation is bound to enforce, or hold valid, any contract which is injurious to its own rights, or those of its citizens, or which offends public morals, or violates the public faith. The latter says, " where it (a contract) is of an immoral character, or *contravenes the policy of the nation to whose tribunal the appeal is made,* the remedy which the comity of nations affords for enforcing the obligation of contracts wherever formed, is denied."

Now in the case before us, the assignment or the duty of the trustee under it, was in part, at the least, to be executed in this state, where, as appears, as already mentioned, a portion of the property proposed to be transferred by it was then situated.

These principles seem to have been reduced to practice in the

case of *Ingraham* v. *Geyer*, 13 *Mass. Rep.* 146. B and R merchants in Philadelphia, made an assignment of all their effects and credits to certain persons, in trust for such of their creditors, as within four months should execute a full release ; the surplus to be disturbed *pro rata* among their other creditors, and the remainder, if any, to the assignors. The question, the court said, was whether the assignment was valid in Massachusetts, so as to defeat a subsequent attachment of a debt there. They held that such an assignment could not be supported if made in Massachusetts, by parties residing or living there, and with a view to be there executed. " And supposing (they said) the assignment to have legal effect in the state of Pennsylvania, so as to bind the creditors within that state, it does not follow that it is to be received here, to the prejudice of creditors who are our own citizens. It is not required by the comity of nations."

There is another exception, or limitation of the general doctrine well established in the American courts, which bears a strong analogy to the case before us. In cases of intestacy, says C. J. Tilghman, in *Milne* v. *Moreton*, the property is distributed according to the law of the domicil of the intestate. But yet so far as concerns creditors, it depends on the law of the country where it is situated. If an Englishman dies and leaves property here, we regulate the order in which his debts shall be paid according to our own law ; the residue is distributed according to the law of England. This Rule was enforced in *Smith* v. *The Union Bank of Georgetown* in the Supreme Court of the U. S. 5 *Peters*, R was, at his decease, domiciliated in Virginia, and owed there a debt on bond, which is there preferred to a debt by simple contract. He was indebted by simple contract and had personal estate in the city of Washington, where administration was granted, and where the laws of Maryland, which admit no preferences, govern. It was held that the effects in the hands of the administrator, were to be distributed among the creditors according to the laws of Maryland, and not of Virginia. Justice Johnson, in delivering the opinion of the court, made several apposite remarks—" that personal property, has no *situs*, seems rather a metaphysical position, than a practical and legal truth." " In point of fact it

cannot be questioned, that goods found within the limits of a sovereign's jurisdiction, are subject to his laws ; it would be an absurdity, in terms, to affirm the contrary." "It is an acknowledged doctrine, that in conflicts of rights, those arising under our own laws, if not superseded in point of time, shall take precedence, "*majus jus nostrum quam jus alienum servemus.*" The obligation of the sovereign to enforce his own laws, and to protect his own subjects, is acknowledged to be paramount." "Contracts *contra bonos mores*, or against the policy or laws of a state, will not be enforced in the courts of that state, though lawful in the state in which they are entered into."

The principles on which this exception is sustained, apply with great efficacy to resist the action in the case before us, of the foreign assignment upon the property here.

Thus far I have referred exclusively to American jurists. Similar doctrine will be found maintained in the English courts. In *Hunter* v. *Potts*, 4 *D.* and *E.* 182, Lord Kenyon, for the Court of Kings Bench, said—the only question is, whether or not property in that island (Rhode Island) passed by the assignment (under the bankrupt law) in the same manner as if the owner (the bankrupt) had assigned it by his voluntary act. And that it does so pass cannot be doubted, unless there were some positive law of that country to prevent it. Every person having property in a foreign country, may dispose of it in this, though, indeed, if there be a law in that country directing a particular mode of conveyance, that must be adopted. In *Sill* v. *Worswick*, 1 *Hen. Bl.* 690, Lord Loughborough, after stating the general doctrine, and maintaining that it gives efficacy to a commission of bankruptcy over the property of the bankrupt out of the jurisdiction of the laws of England, adds—when I have laid this down, it by no means follows that a commission of a bankrupt has operation in another country against the law of that country. If the law of that country preferred him (a creditor there obtaining payment of his debt) to the assignee, though I must suppose that determination wrong, yet I do not think that my holding a contrary opinion would revoke the determination of that country, however I might disapprove of the principle on which that law so decided. In *Potter* v. *Browne*,

5 *East.* 131, Lord Ellenborough said—" we always import, to-gether with their persons, the existing relations of foreigners as between themselves, according to the laws of their respective countries, except, indeed, where the laws clash with the rights of our own subjects in England; and one or other of the laws must necessarily give way, in which case our own is entitled to the preference."

The same general doctrine has also been maintained in the courts in Scotland. In *Levett* v. *Levett, Ferguson's Scot. Consist. Reports,* 633 ; *Ingraham's Ecclesiastical Reports,* 366, assuming that the law of the contract is everywhere entitled to obedience from considerations of its equity, yet this, like every other general rule, cannot be received without limitation. Wheresoever the foreign law stands opposed to the principles of religion or of morality, or to the municipal institutions established in the country where it is sought to be applied, it must cease to operate. For it is clearly the duty of every state to keep its religion and morals pure, and its institutions entire." In *Edmondstone* v. *Lockhart, ibid.* 168, *ib.* 397, "In the annunciation of the principle upon which respect to a foreign rule is required, the conditions have always been added, that this shall be conceded only when no injury shall thereby arise to the country or people to whom the right of jurisdiction belongs, in whatever regards the independence of their own system of law, or the interests of religion, morality and good order, within the state. It was quite clear that the municipal rule of the law of Scotland could not, according to the principles of international law, be sacrificed, when essential injury to our own system must plainly follow." In *Gordon* v. *Pye, ibid,* 460, it is now held that full effect is to be given to a contract entered into abroad, if the forms and solemnities requisite to its validity in the foreign country have been duly adhibited, although they should be in every respect different from those in use among ourselves. Our deference for the foreign law, or in other words the *comitas* we exercise towards it, goes thus far, that when the validity of any deed is in question, as far as form is concerned, we look to what is required for this purpose by the law of the country where it is entered into. If valid there, we give full effect to it; but always under this limitation, that our doing so does not

affect our own essential policy or institutions, or the interests of morality in our own country." In page 466, "It is admitted in every case where the application of the principle of *comitas* is concerned, that when the admission of the foreign law would be clearly inconsistent with the essential policy and institutions of the country where it is proposed to be received, this must create an effectual bar to the extension of the principle to such a case."

It would be interesting to pursue this subject into the writings and disquisitions of the *juris consulti* of the continent of Europe so far as they are within our reach. I shall, however, content myself with a passage from *Huberus*, who, whatever may be the rank or reputation to which he may be entitled, about which a considerable conflict of opinion has prevailed, has certainly been more frequently cited and more confidently relied on in our courts than any other continental author, and has therefore served more than others, as a guide here. He says, *vol.* 2. *B.* 1, *Tit.* 3, (4) 3 *Dallas*, 376. " Whatever the laws and judicial proceedings in any place decide as to their subjects, other people allow to have the same effect with them, unless a prejudice or inconvenience would result *to them or their laws.*" (1) 3 *Dall.* 374. " The place where the contract is entered into is not to be exclusively considered, if the parties had in contemplation another place at the time of the contract; the laws of the latter will be preferred in the construction of the contract. (2) *ibid* 375. The effects of a contract entered into at any place, will be allowed according to the law of that place, in other countries, if no inconvenience results therefrom to the citizens of that other country with respect to the law which they demand. (3) *ibid* 375. If the law of the place in another government is contrary to the law of our state, in which also a contract is made inconsistent with a contract celebrated and made in another place, it is reasonable, in such case, that we should observe our own law rather than a foreign law."

These doctrines are in entire harmony with the principles contained in the cases to which I have heretofore adverted.

A brief review of the cases cited by the plaintiff's counsel, will serve to develope and illustrate further these doctrines, and afford an opportunity to explain and remove some objections

which at first sight may seem to arise to them, or to their application.

Succession to personal property, as in *Bruce* v. *Bruce*, 2 *Bos. Pul.* 230, *note*, and in *Benefide* v. *Johnson*, 3 *Vez.* 198, which is universally regulated by the law of the domicil of the owner at his decease, stands completely distinguished from the subject now under consideration. The country or government in which the property is situated, can have no interest in the mere distribution, and will therefore exercise no control over the property farther than the rights or claims of creditors are concerned, and in that respect as we have seen, the *lex rei sitæ* and not the *lex domicili* is to prevail. In *Dixon* v. *Ramsay*, 3 *Cranch*, 319, the question was, whether an executor who had obtained letters testamentary in England, could maintain a suit in the district of Columbia without letters testamentary there. The court held that no man can sue in the courts of any country whatever his rights may be, unless in conformity with the rules presented by the laws of that country. And although all rights to personal property are to be regulated by the laws of the country in which the testator lived, yet the suits for those rights must be governed by the laws of that country in which the tribunal is placed. The substance of the decision of the court is, that whatever may be the right of a party, his remedy must conform to the law of the forum. The disposition of the personal property and the rights of the legatees, are to depend on the law of the domicil. With it the testator is presumed to be conversant, and by it to regulate his bounty, and his manner of disposal. The rights to the property are therefore to be thereby governed. The language of the court is to be taken in reference to the question before them. They were not called to express any opinion on the validity and effect of a disposition proposed to be made by a foreign testator, in a manner prohibited by the laws of the country where the property is situate. In *Desesbats* v. *Berquier*, 1 *Binny*, 336, Theil, the supposed testator when he made the instrument preferred as a will, was a resident of St. Domingo, and a subject of France, and by the laws of that island, the instrument was not a will. It was very properly held that it could not therefore be proved, or supported as a will in Pennsylvania, although if made there, and the testator had there

been a citizen, and the property would have passed by it. As the will was void where it was made, and where the maker of it resided, the court held it void every where. As he died intestate by the law of the place where he was domiciled, he must be regarded elsewhere in the same character. There is nothing in the decision or the observations of the court, which serves to show they would have held themselves bound to maintain a disposition which a foreign testator might have sought, by his will, if such disposition had been forbidden or declared fraudulent and void, by the law of Pennsylvania; because such disposition might be admissible or consistent with public policy, where the testator resided. The remark by Lord Ellenboro' in *Potter* v. *Brown*, 5 *East*, 134, that it is every day's experience, to recognize the laws of foreign nations as binding on personal property, was made without any reference to the result of a conflict of laws as is evident from the remarks which he makes immediately afterwards and which I have heretofore mentioned.

The case of *Greenwood* v. *Curtis*, 6 *Mass.* 358, can furnish no support for the plaintiff's claim. The recovery in that case was not on the note or promise for the delivery of slaves, for the counts founded thereon the court laid out of the case, but upon the third count, on an account stated, the consideration of which the court say was the sale of a cargo of merchandize which therefore involved nothing immoral or illegal. In discussing the case the court state this general doctrine—" By the common law upon principles of national comity a contract made in a foreign place and to be there executed, if valid by the laws of that place may be a legitimate ground of action in the courts of this state, although such contract may not be valid by our laws or even may be prohibited to our citizens." The qualification which the court here gave to the rule, shows that it cannot be brought to bear on the facts before us. And the exceptions which the court immediately make to the rule, proves the result more distinctly, and serves to show that the views of the court accord with the general doctrine which I have stated. A contract for the sale and delivery of merchandize, in a state where such sale is not prohibited, may be sued, the court say, in another state where such merchandize cannot be lawfully imported. But if the delivery was to be in a state where the importation was in-

terdicted, the contract could not be sued in the interdicting state, because the giving of legal effect to such a contract would be repugnant to its rights and interest. Upon the same principle it seems to me, the courts of a state ought not to give legal effect to a contract or transfer of property which is repugnant to the express law of the state and to its obvious policy.

The case of *Chartres* v. *Cairns* in the Supreme Court of Louisiana, found in a note to 5 *Cowen* 578, seems more nearly in point than the other cases to which we have been referred. The court gave efficacy over a subsequent attachment to an assignment made in New York, where the parties to it resided, and where they supposed it to be valid, although by the laws of Louisiana on the subject of insolvency, it would have been null and void by reason of a provision or reservation contained in it for the benefit of the grantor. This case is but shortly stated, and we have not the views and reasoning of the court so distinctly as could be wished. Much reliance seems to have been placed on the fact that both parties, interested in the suit, the attaching creditor and the debtor, the assignor, were citizens of New York, and that no citizen of Louisiana was affected. Whatever respect then may be justly due and yielded to the highly respectable tribunal by whom the decision was made, I am unable to yield a prevailing weight to their decision which seems to me, so far as it is analogous to the case before us, not required by, and inconsistent with, the sound principles of international law. And moreover, this decision appears to me in no inconsiderable degree to depart from other cases said to have been decided in the same court, and cited Livermore's Dissertations 137. It is to be regretted that we have not access to the volumes of the Louisiana reports from which these cases are cited.

The plaintiff's counsel in his argument made certain concessions under the weight and influence on his mind of the legal doctrines which ought not to be overlooked, although if incorrectly made, I should be unwilling, in any wise, to prejudice his cause by them. "I admit," said he "a foreign debtor cannot *fraudulently* put his property *here* out of the reach of *our* process any more than a domestic debtor can; but a foreign debtor has precisely the same control over his property here as a domestic debtor has."

Now a transfer of this nature by a domestic debtor, would un-

questionably be fraudulent and void according to the very terms of the statute, and if a foreign debtor cannot fraudulently put his property out of the reach of our process, any more than the domestic debtor, how can the merchandize now in question be out of the reach of the execution. And if a foreign debtor has precisely the same control over his property here as a domestic debtor, how can he make such an assignment as, in the hands of the domestic debtor, would be fraudulent and void?

While then I am prepared to give full weight to the principles which sustain foreign contracts and foreign transfers, and especially when made in the other states of this union, whether it be on the ground of comity as some place it or of international law as others choose to call it, I do not feel authorized to give validity to this assignment, which would effect a transfer of property under the control of our laws, in violation of their policy, in hostility with their provisions, and which they declare to be fraudulent and void.

I have hitherto, to avoid complexity and confusion, spoken of the whole of these articles of merchandize as if falling, as I hope I have shown part of them unquestionably does, under the operation of the legal doctrines which I have suggested. It is necessary, however, that a discrimination should be made. A part of the merchandize seized by the sheriff, was sent to the store in Paterson by the plaintiff after the assignment, and had never belonged to Roy. Another part was also sent there after the assignment which had, belonged to him and was in his store at New York, and was comprehended in the assignment, and of which a valid transfer was thereby made. Both these parts then being at the levy of the execution, clearly the property of Varnum, were improperly taken by the sheriff. They amount according to the testimony to one half of the property or thereabout.

It thus appears that the plaintiff in replevin is entitled to a portion of the articles replevied and the defendant is entitled to the residue. And the judgment should be so rendered as to secure their respective rights.*

* NOTE. The foregoing opinion was drawn up and read by the late Chief Justice EWING at chambers to his two associates, who had drawn opinions respectively to the same effect; but as his contained a more full exposition of the cases, it was adopted at chambers *for the opinion of the court,* and would have been delivered by him the ensuing term but for his lamented death. It is now given as such by his late associates.

But as the verdict does not distinguish the goods belonging to the plaintiff from those which do not belong to him, according to this decision, there must be *a venire de novo*, and one is accordingly ordered.

CITED in *State* v. *Falkenburg,* 3 *Gr.* 323 ; *State* v. *Ross,* 3 *Zab.* 524 ; *Frazier* v. *Fredrick,* 4 *Zab.* 166 ; *Dacosta & Davis* v. *Davis & Hatch,* 4 *Zab.* 332.

*Fairchild* v. *Hunt,* 1 *McCarter,* 371, 372 ; *Bently* v. *Whittemore,* 4 *C. E. Green,* 464 ;REVIEWED & AFFIRMED *in Moore* v. *Bonnel & Dusenbury,* 2 *Vroom.* 90.